### In re CHICKEN ANTITRUST LITIGATION.

#### Civ. No. C74–2454A.

United States District Court,
N.D. Georgia,
Atlanta Division.

Aug. 4, 1980.

See also, D.C., 560 F.Supp. 957 and D.C., 560 F.Supp. 998.

## ORDER

O'KELLEY, District Judge.

In keeping with the conditions set forth in the class notice, the court conducted an evidentiary hearing on November 19, 1979, to air objections to the settlement agreements, fee applications, and the interclass sharing proposal. By order of March 7, 1980, the court approved the settlement agreements, with the unanimous consent of all the parties, as fair, adequate, and reasonable. Final judgments were then entered on March 19, 1980, dismissing with prejudice the complaints as to all defendants not previously dismissed—except for the National Broiler Marketing Association; which was dismissed without prejudice— and the counterclaims filed by certain defendants, but the court retained jurisdiction over No. C74–2454A to administer the settlements. The entry of judgment signaled a sonorous end to a protracted, contentious litigation; however, it may be that the hostilities between the plaintiffs and the defendants will pale in comparison with the disputes yet to be resolved. All told, the settlement agreements created a fund of approximately 35 million dollars. The next and final step in terminating this litigation is to distribute the settlement fund among the more than 2,700 claimants.

The first order of business, though, is to pass upon the fee applications submitted by the plaintiffs' counsel, who claim a portion of this fund for out-of-pocket costs and as fees for their role in negotiating these settlements.[1] These applica-

---

1. The court notes at the outset that no objections to any of these fee applications have been made, though the analysis would be the same if the validity of one or several were challenged. The sixty claimants objecting to the plaintiffs' interclass sharing proposal, who will be introduced more formally in the third and final chapter of this chicken antitrust chronicle, requested in a brief filed with the court that an award of attorneys' fees await the court's determination that all attorneys acted in the class' best interests and exercised sound legal judgment in drawing up and approving the interclass sharing proposal. Although the sixty claimants were represented at the hearing, no objection was made when the court extended to all present the opportunity to comment or to present testimony on pending matters. Even

tions, 15 in number, contain requests for fees amounting to over $2,900,000.00, not including any multiplier, and costs of $199,-113.03. These petitions are not based upon any pre-existing arrangements between the represented members of the plaintiff class and their attorneys [2] or upon any statutory authority for awarding attorneys' fees, since the pertinent statute, section 4 of the Clayton Act, 15 U.S.C.A. § 15, does not apply to cases such as this one where the parties stipulated to the dismissal of the suit rather than litigated to a judgment. Their source is instead an independent outgrowth of the court's equitable power to prevent unjust enrichment of members of a class who derive benefits from a common fund created by the labors of others by spreading the costs of the litigation among the fund's beneficiaries. Under the principle recognized in *Trustees v. Greenough,* 105 U.S. 527, 26 L.Ed. 1157 (1881), and later refined in *Sprague v. Ticonic National Bank,* 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184 (1939), an attorney of the prevailing party may apply for a portion of the fund as compensation for his successful efforts above and beyond reimbursement for out-of-pocket expenses, a notable exception to the American practice of denying to the prevailing party recovery of his attorney's fees as costs or otherwise. *See Boeing Co. v. Van Gemert,* 444 U.S. 472, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980); *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975); *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 391–92, 90 S.Ct. 616, 625, 24 L.Ed.2d 593 (1970). But, notwithstanding the universal

acceptance of the equitable fund doctrine as a basis for awarding attorney's fees to the successful party, the courts have experienced considerable problems in accommodating the competing interests involved. On one hand, the court is anxious to encourage private parties represented by private counsel to undertake litigation for the common good as private attorney generals in the hope that the threat of litigation will deter further violations of the law and that the successful prosecution of antitrust suits will disgorge antitrust violators of their illegal profits and return them to the victims. By adopting a policy of rewarding counsel for their efforts, the court can make the difficult decision to undertake an antitrust suit more palatable, thus ensuring that the plaintiff's antitrust bar will contain members with the skill and experience necessary to wrestle with these usually complex antitrust suits. At the same time, however, the court's desire to provide counsel with an incentive to prosecute antitrust suits must be tempered by its responsibility to jealously guard the rights of the beneficiaries of the fund, whose legal injuries prompted the litigation and whose redress is the principal reason for the creation of the fund. Though the common fund doctrine may be predicated upon an equitable principle disfavoring unjust enrichment and encouraging the recapture of any windfall to the class, the recovery due the plaintiffs here is not a windfall in the sense that it represents undeserved gain. Upon the premise that the plaintiffs' allegations of trade restraint and artificially high prices are true, the claimants incurred some injury for ev-

assuming that this objection has not been abandoned, the court is not willing to conduct a witch hunt among the plaintiffs' counsel without some evidence of misdealing or other improprieties.

**2.** The statement that no fee arrangements were entered into demands a minor qualification. The plaintiffs' counsel did agree—win, lose, or draw—to pay their first liaison counsel, Mr. Vickery, the actual historical value of his services. If the court chooses to award less than this value, as represented in his fee application, all the plaintiffs' counsel must make up the difference. As for Mr. Bondurant, Mr. Vickery's successor, all agreed that he would re-

ceive no less than 15% of all the attorneys' fees awarded, excluding those awarded to Berger & Montague. Again, all agreed except for the firm of Berger & Montague, to pay the deficit if the court's estimation of the reasonable value of Mr. Bondurant's services is less than 15% of this total. It should be noted that all counsel have agreed to limit the total fees awarded to all applicants to 15% of the settlement fund. Also, the firm of Freeman, Rothe, Freeman & Salzman entered into a contingent fee contract with the State of Illinois, but the firm has waived its rights under this agreement in favor of the court's award of fees.

ery broiler purchased from the defendants during the NBMA's existence; yet due to the large number of claims, each claimant will recover only a fraction of the excess prices paid. Therefore, the court cannot discharge its responsibility to protect the unrepresented, absent class members unless the plaintiffs' litigation costs are allocated in some reasonable proportion to the benefits conferred upon the class.

While the court has wrestled with several difficult legal issues during the course of this litigation, perhaps none was more complicated than the valuation of the legal services rendered on behalf of the plaintiff class. The approximation of a reasonable value is a proper exercise of the court's discretion, but to say that the award of reasonable fees is committed to the sound discretion of the court is only to state the crux of the problem. Little in the way of guidance is offered the court in evaluating these applications to assure that the attorneys are not shortchanged or that the class is overcharged. Indeed, given the nature of the court's task, no method could be devised that would permit the court to determine with mathematical precision the monetary value of each attorney's contribution to the successful settlement of these cases. What is reasonable depends first upon the outcome. If the plaintiffs' counsel succeed in negotiating a favorable settlement for the class, then their fee award should reflect this fact, but a large settlement fund can stand as a monument to the outstanding prestige, skill, and vigor of the class' counsel, or may simply reflect the number of possible claimants or the broad scope of the defendants' activities, with only a modest contribution by counsel. To compensate for the lack of a tested formula for computing the market value of these services, the courts have fallen back on a medley of variables designed to isolate the contribution by the plaintiffs' counsel from the impact of these other factors, to appraise its value, and to distribute these costs fairly among the beneficiaries. *E.g., City of Detroit v. Grinnell Corp.,* 560 F.2d 1093 (2d Cir.1977); *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sani-*

*tary Corp.,* 540 F.2d 102 (3d Cir.1976), and 487 F.2d 161 (3d Cir.1973); *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974); *In re Master Key Litigation,* 1978–1 Trade Cas. (CCH) ¶ 61,887 (D.Conn. 1977); *In re King Resources Co. Securities Litigation,* 420 F.Supp. 610 (D.Colo.1976); *In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions,* 410 F.Supp. 680 (D.Minn.1975). See also Code of Professional Responsibility Canon 2, EC 2–17, EC 2–18, Disciplinary Rules DR 2–106(B). The clear tendency has been to analyze fee applications more critically to ensure that the class is charged with only those services benefiting it by eliminating, and thereby discouraging, duplication and wasted effort. Though basically the same standard is used nationwide, the results have differed, with some courts using a sharper scalpel than others. *Compare In re Armored Car Antitrust Litigation,* 472 F.Supp. 1357 (N.D.Ga. 1979) *with Arenson v. Board of Trade of Chicago,* 372 F.Supp. 1349 (N.D.Ill.1974).

For several reasons the court does not relish the task of passing on these applications. To begin with, the court is pleased with the results and with counsel's performance on behalf of the class. As are most individuals who have followed the course of this litigation since its inception six years ago, the court is impressed by the favorable terms upon which the plaintiffs agreed to dismiss their suits. Surely a good deal of the credit for this result goes to counsel who by their unwavering persistence and imaginative strategy were able to wear down the defendants' opposition until they capitulated to the plaintiffs' demands. In keeping with its duty to absent class members, however, the court must measure the full extent of each applicant's commitment to this litigation, awarding fees for only that time spent for the benefit of the class. A principal criticism of awarding fees under the equitable fund doctrine has been that attorneys receive a windfall at the expense of the injured class members, that the courts, mesmerized by the extraordinary success on what was believed to be a weak claim, have failed to show solicitude for the

class members' interests. If in response to this criticism the courts have demonstrated a propensity to scrutinize fee applications more carefully, the experience has not made the task easier each time it arises. Although the applicants have supplied reams of paper documenting the hours spent on these cases, and the court has been overseeing this litigation since its commencement, the court still finds it exceedingly difficult, without painstakingly examining each allocation of attorney time down to the fraction of an hour, to pinpoint instances when less attorney time would have accomplished the same result or where two or more applicants duplicated one anothers' labors. Obviously, in any case where the parties settle before trial, some time spent researching issues of liability and preserving the testimony of witnesses will represent wasted effort; this is especially true here since these cases were settled when discovery on the class certification issue was just beginning to wind down. But the court does not believe that to discharge its responsibility to class members it must meticulously pour through each application, examining each entry and comparing it with time spent by other attorneys in the case—in essence, demanding that the applicant justify each and every use of his time. All that is required is for the court to estimate a reasonable value for the services performed by each applicant, under all the circumstances. *See Piambino v. Bailey,* 610 F.2d 1306, 1328 (5th Cir.1980).

As a likely starting point the court chooses to first compute the fee the applicant might reasonably charge any client for this type of work and then adjust this amount to reflect the peculiar circumstances of this litigation, an approach perhaps first adopted in *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.,* 487 F.2d 161 (3d Cir.1973), but since used by a number of courts in a wide variety of cases. *See Matter of First Colonial Corp. of America,* 544 F.2d 1291 (5th Cir.), *cert. denied,* 431 U.S. 904, 97 S.Ct. 1696, 52 L.Ed.2d 388 (1977); the cases listed in *Newberg on Class Actions* §§ 6922, 6924 (1977 & Supp.). This initial emphasis on what the attorney might customarily bill in a noncontingent case replaces the traditional approach of assessing the applicant's contribution in terms of a flat percentage of the settlement fund. Because the fee would be paid in part by absent class members, who in effect had been represented on a contingent basis, the courts felt that a percentage of the recovery would reflect more accurately the value of the attorneys' services to the class as a whole. This court feels, like the court in *Lindy Bros.* obviously did, that only by tying the ultimate fee to the actual hours worked in creating this benefit for the class can it ensure that the result will be fair and thus escape the criticism heaped upon courts for awarding what are believed to be exorbitant attorneys' fees. The court readily admits that undue emphasis on the time devoted to this litigation is open to charges of being artificial and arbitrary; a large number of hours could mean any number of things, including that the litigation raised complex issues calling for an unusually high number of man-hours or that the attorneys involved have been inefficient and have unnecessarily duplicated each other's efforts. *See Trans World Airlines, Inc. v. Hughes,* 312 F.Supp. 478 (S.D. N.Y.1970), *modified on other grounds,* 449 F.2d 51 (2d Cir.1971), *rev'd on other grounds,* 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973). But in adhering to this approach the court is not selecting one method of computing fee awards over another, because in reality neither the time/hourly rate nor the percentage recovery approaches are in themselves totally adequate for this endeavor. The latter underscores the size of the recovery, which may mean that a large fee will be awarded when only modest effort was involved, or that only a small fee is allowed from a small recovery, even though an unusual amount of skill was required and the case was extraordinarily complex, while in concentrating on the number of hours expended, the court may reward inefficiency and penalize efficiency. The formula to be used here incorporates the best features of both in a two step process. The figure derived

by multiplying the number of hours spent by the hourly rate selected by the court—the "lodestar" component of the fee award—is certainly no more than a useful starting point, for this total is not an accurate measure of the full benefit conferred upon the class when serious risks of failure are overcome in the process of creating a large settlement fund. *See Knighton v. Watkins,* 616 F.2d 795 (5th Cir.1980). After the first round of calculations, the lodestar must be modified to account for the impact of a number of less objective factors, which when aggregated provide a rough measure of the risk involved, the quality of the work rendered, and the enduring effects of the litigation. *See Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir. 1974). From an evaluation of these shifting variables, the court can determine to what extent the lodestar should be enhanced or diminished to reflect the unusual circumstances of this case. The courts cannot expect the higher caliber firms or attorneys to agree to prosecute complex antitrust cases against well-financed, able defense attorneys unless they have reason to believe that they will be rewarded if after a protracted struggle they are successful.

▄▄▄ On the assumption, then, that the court is more likely to derive a reasonable base for computing an appropriate fee award by approximating the historical value for the services rendered, the first step is to total the number of compensable hours spent by each applicant in the class' behalf. To compute these hours the court has relied on the records furnished by each applicant, which itemize the time spent on a variety of services in fractions of an hour. These records have been examined with several objectives in mind. First and foremost is to eliminate time spent on tasks that was duplicated by another member of the same firm or by another firm. In multi-party cases involving several firms the danger of duplication always exists if only because the lines of communication between the participating firms may not be functioning constantly. When it is apparent that some redundancy among firms is present, the court has eliminated these unnecessary hours in accordance with the chain of command and the division of labor established among the plaintiffs' counsel; if one firm was assigned or simply assumed sole responsibility for a given chore, then the hours it reasonably spent in conferring this specific benefit upon the class were spared over those expended by another firm merely duplicating its effort. To the extent possible the court has consistently endeavored to excise those hours that did not go directly towards creating a benefit for the class. Practically any time spent on this litigation by these attorneys arguably contributed to the settlement of the cases and thus indirectly conferred a benefit upon the class, even though the time was actually devoted to a client's special interests, which may or may not have coincided with those of the class. Where feasible, then, the court has attempted to distinguish between time spent in promoting the interests of a client and those of the class as a whole. Also included within this noncompensable category are many of the hours spent reviewing the numerous pleadings that crossed the desks of plaintiffs' counsel; while the court may agree that it is important for everyone to keep abreast of the recent developments in all the cases, at some point the diminishing returns of further review preclude charging these hours to the class. Again, the line between compensable and noncompensable hours was drawn according to the divisions of labor established among the plaintiffs. In reviewing these applications the court did not eliminate all the hours spent researching or otherwise preparing for liability issues, even though these theories were never put to the test before the cases were settled and therefore the benefit to the class from this work is more remote than the time spent negotiating with the defendants. The court recognizes, though, that a command of the legal principles affecting all the major issues in the litigation may be indispensable in settlement negotiations, where the outcome is likely to turn upon counsel's ability to persuade their opponents that their legal position is tenuous or that at the very least

an extremely long and expensive trial will be necessary to resolve the more complex issues. The relative value of each service to the class can be expressed by assigning a higher hourly rate of compensation to those tasks conferring a more direct benefit upon the class.

The next obvious step, then, is to value this time, both in terms of how the time was spent and by whom. The court has endeavored to classify the time spent during this litigation by each applicant under the following eight generic headings in order to facilitate the process of computing a reasonable lodestar value:

(1) *depositions and discovery*—includes preparation of and response to interrogatories and preparation for and conduct of depositions, but does not include discovery motions or responses; also includes travel time to and from scheduled depositions when listed separately;

(2) *general research and examination of documents*—includes research on all issues related to litigation and review of papers and correspondence submitted by all parties or attorneys;

(3) *briefs, pleadings, or other court papers*—where possible includes research of issue and preparation of brief on the same issue;

(4) *hearings and preparation for court*—includes pretrial conferences, meetings with the special master, and, where possible, travel time;

(5) *consultation with other attorneys, parties, and claimants*—includes time spent drafting inter-class sharing proposal;

(6) *settlement negotiations;*

(7) *administrative matters attributable to the multi-party case*—preparing filing system for pleadings, class notice, and settlement administration;

(8) *miscellaneous activities*—e.g., consultation with client.

The court feels that under the circumstances it is more reasonable to compensate time spent, for example, negotiating settlement agreements and conferring with co-counsel at a higher rate than that spent researching issues, conducting discovery, and drafting legal briefs. The court admits that some of the totals derived under each of these categories are rough approximations, since several of the time records furnished the court clumped many different types of legal services together on a chronological basis, but overall this system of grading should give the court a better idea of how each applicant allocated his time.

The customary hourly rate charged for noncontingent cases by the attorneys and firms involved in this litigation range from $250 per hour for a senior partner to $40 per hour for a young associate to $15 per hour for a paralegal. Trammel Vickery, the plaintiffs' expert witness on attorneys' fees, testified at the hearing held on November 19, 1979, that these customary fees, if anything, were too low given the skill and experience of many of these attorneys. The court has no reason to doubt that the hourly rates quoted by the applicants are indeed what these attorneys would charge for their professional services when payment is virtually guaranteed; nor does the court intend to challenge Mr. Vickery's testimony that as they stand these rates constitute a reasonable hourly charge for the attorneys' time and that these rates are not adjusted to compensate the applicants for contingencies or for the inflationary erosion of their fees due to late payment. But at the same time the court does not believe that these customary market rates, as reasonable as they might otherwise be, are especially relevant when the fee will be awarded from a fund created for the benefit of an unrepresented class. The hourly rate charged these absent, unrepresented class members for the purpose of computing a lodestar award should reflect what an attorney with similar experience, background, skill, and reputation would charge under the same circumstances. The rates quoted by the applicants here are not the hourly rates that they would charge a client for work done in risky litigation. The area of risky litigation is pervaded by contingent fee agreements, which presumably are drafted to compensate the attorney for as-

suming the risk of recovering nothing for his labor over and above what he customarily charges for his legal services in noncontingent matters. Some courts nonetheless have used the hourly rate quoted by each attorney to compute a lodestar award, *e.g., In re Ampicillin Antitrust Litigation,* 81 F.R.D. 395 (D.D.C.1978), while others have resolved this problem by either assigning mixed hourly rates across the board for partners, associates, and paralegals or by independently setting hourly rates for each applicant. *E.g., National Association of Regional Medical Programs, Inc. v. Weinberger,* 396 F.Supp. 842 (D.D.C.1975), *aff'd,* 546 F.2d 1043 (D.C.Cir.1976); *Entin v. Barg,* 412 F.Supp. 508 (E.D.Pa.1976); *see Payne v. Travenol Laboratories Inc.,* 74 F.R.D. 19 (M.D.Miss.1976) (applied lower local billing rates to out-of-town counsel).

After taking into consideration the skill, experience, and standing of these applicants, the court feels that the hourly rate used to compute this lodestar value should not exceed $150 per hour for any attorney or activity. The court is aware of other decisions, *e.g., In re Ampicillin Antitrust Litigation,* 81 F.R.D. 395 (D.D.C.1978); *In re Equity Funding Corp. of America Securities Litigation,* 438 F.Supp. 1303 (C.D.Cal. 1977), in which the courts adopted lodestar hourly rates as high as $200 per hour, as well as a number of cases in which the rates used were much lower than the applicant's customary billing rate. The decision to hold these applicants to a ceiling of $150 per hour does not conflict in principle with the results in these cases. What is reasonable in any given case must turn upon its peculiar circumstances. By adopting a lesser hourly rate of lodestar compensation here, the court does not mean to imply that counsel in these cases turned in a lower level of performance than in those cases where a significantly higher rate was approved without objection. The court simply feels that a range of rates topping off at $150 per hour will reasonably compensate even the most experienced attorney for his contribution to the creation of this settlement fund. The bottom end of this scale, occupied by paraprofessionals, will be $25 per hour. The middle range of rates will be designated as the court has an opportunity to assess the skill, experience, and reputation of every attorney involved. By applying these hourly rates to the compensable hours logged by each applicant, the court can then derive the first element of the fee award, the lodestar.

### Harold C. Brown

But before actually computing a lodestar award, the court first must dispose of a matter troubling it for some time, the fee application of Harold Brown, co-counsel for the State of Connecticut and for Messrs. Migliaccio and Grammas. In his first application Mr. Brown claimed that he spent 1,030.50 hours in this litigation. Admitting that a mistake had been made in compiling these hours, he later amended his petition, drastically reducing this total to 265.3 hours. At the hearing on these fee applications the court questioned Mr. Brown about the discrepancy between the two computations. He attributed the inflated request to his failure to keep reliable, ongoing records of the time he devoted each day to the various cases he handles. He noted, however, that his amended application understates the amount of time he has spent. According to Mr. Brown, of this more modest figure, eighty-six hours were taken from entries in his private diary; the balance was reconstructed from a close examination of the various papers pertaining to this suit, the docket sheets, and his best recollection. The court does not question that Mr. Brown played a role, albeit an early one, in the prosecution of these cases. Messrs. Berger and Montague, with whom Mr. Brown associated in the early stages of these suits, confirmed at this same hearing that Mr. Brown was a, if not the, originator of the chicken antitrust litigation. The State of Connecticut retained him to bring a class action against the NBMA; he subsequently filed the first national class action in this litigation on behalf of Connecticut and a class consisting of all states and subordinate governmental entities. Messrs. Berger and Montague also agreed that af-

ter this suit was filed Mr. Brown continued to assist them in devising strategy and in responding to discovery requests, though the principal burden of carrying this case forward shifted to their firm. Mr. Brown, however, never attended any strategy conferences, participated in any settlement negotiations, or appeared in court with the rest of the plaintiffs' counsel.

The court does not question that Mr. Brown was instrumental in the formative stages of this litigation or that on occasion he helped Messrs. Berger and Montague fulfill their responsibility to their joint clients after the burden of prosecuting these suits shifted to Messrs. Berger and Montague's firm. But nonetheless the court feels that his application for attorney's fees should be denied. To begin with, the services performed by Mr. Brown were to a considerable extent rendered on behalf of his clients, the State of Connecticut and the franchisers Migliaccio and Grammas, with little or no spillover to the direct benefit of the class. An award of attorney's fees from the settlement fund can be predicated only upon those services performed or the hours spent benefiting the whole class. In reviewing these applications, the court has endeavored to differentiate between hours spent benefiting only one client and those that inured to the benefit of the whole class, using only the latter to estimate a reasonable value of the attorney's contribution to the settlement of these cases. The court has also refused to consider some of the hours spent reviewing pleadings and other papers, since this time is usually of only a marginal benefit to the class after everyone involved in the litigation has perused the same papers or transcripts. The court is persuaded after examining Mr. Brown's application that many of the hours claimed are not compensable under the equitable fund theory.

The more serious concern, however, pertains to his initial—and what the court perceives to be grossly excessive—application for attorney's fees. Mr. Brown originally requested an award from the settlement fund based on the 1,030.5 hours that he claimed were spent on behalf of the class. Had this application not been amended to reduce the hours claimed, the court certainly would not have awarded him the full amount requested, for surely this original application overstates his role in the litigation. The question remains though whether an award can be based on his application as amended. In at least one reported case, *Brown v. Stackler,* 612 F.2d 1057 (7th Cir.1980), a court denied any fee to an attorney who filed what was believed to be an excessive application, even though the attorney represented the plaintiffs in a civil rights suit successfully challenging the constitutionality of a state statute prohibiting the advertisement of the prices charged for dispensing prescription eyeglasses. The Seventh Circuit agreed with the district court that when an obviously unreasonable fee is requested, the court need not compute sua sponte a more reasonable one. Here, perhaps in response to the outcry from his colleagues but certainly not due to any suggestion by the court, Mr. Brown amended his application, reducing the hours claimed by approximately seventy-five percent, but even though he may have brought his claim back within the realm of reasonable possibilities by this drastic reduction, in its discretion the court concludes that attorney's fees should not be awarded Mr. Brown from the settlement fund. The fact that the majority of the hours claimed in the amended application were reconstructed from those same records that supported the original inflated request, although persuasive, is not determinative here, since in appropriate circumstances reconstructed hours, when fair and reasonable, would be sufficient to support an award of attorney's fees. *See, e.g., Harkless v. Sweeny Independent School District,* 608 F.2d 594 (5th Cir.1979); *City of Detroit v. Grinnell Corp.,* 560 F.2d 1093, 1102 (2d Cir.1977). *But see In re Wal-feld Co.,* 345 F.2d 676 (2d Cir. 1965). This court, however, feels, as did the court in *Brown,* that the only sure way to encourage counsel to keep accurate, current records is to reject fee applications based on unreliable accounts of an applicant's participation in a suit. While an attorney of Mr.

Brown's acknowledged reputation may prefer not to bother himself with such a thankless, mundane task as daily recordkeeping, he should expect a chilly reception from the court whose responsibility in awarding attorney's fees from a common fund includes the protection of the class. This duty cannot be discharged unless the court demands that fee petitions be supported by reliable records indicating precisely how much time was spent and on what aspects of the litigation the attorney worked. Otherwise, the admonition that fee awards be reasonable would amount to nothing more than a rule that fee requests not be so unreasonable as to shock the conscience of the court; the predicate for each award must spring from a reliable base of records. The disparity between his two applications demonstrates to the court that Mr. Brown's method of calculating the time he has spent on these cases is inherently unreliable.

The final alternative for the court is to work solely from the eighty-six hours that Mr. Brown states were recorded in his private diary. But, though Mr. Brown testified to the various labors he performed as one of the attorneys in this case, and though Messrs. Berger and Montague for the most part corroborated this testimony, he never explained to the court's satisfaction how such a gross error in totaling these hours could have been committed if he was exercising the supreme care and diligence in preparing his application that he should as a member of the bar and as an officer of this court. Though the court does not mean to suggest that Mr. Brown intended to perpetrate a fraud upon this court, for certainly there is no evidence to support this accusation, it does believe that Mr. Brown's negligence borders on a violation of professional ethics. Disciplinary rule 2–106 of the American Bar Association's Code of Professional Responsibility admonishes attorneys not to charge excessive or unreasonable fees, ones that "a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is in excess of a reasonable fee." The responsibility for ensuring that a fee request is reasonable before submitting it to a court for approval

clearly rests with the attorney. When he fails to exercise the care required to discharge this duty for no apparent reason other than his own unwillingness to keep reliable records, the court feels that an award of attorney's fees would be inappropriate. For all of the above reasons, the court hereby denies Mr. Brown's application for attorney's fees from the settlement fund.

### Dickstein, Shapiro & Morin

Dickstein, Shapiro & Morin [D, S & M] was retained by Purity Supreme, Inc., the class representative for the supermarket class, and by the States of Alabama, Colorado, Florida, Iowa, Kentucky, Michigan, Missouri, Rhode Island, and Virginia, but all agree that the firm carried the laboring oar in the prosecution of this national class action. Aside from representing its own clients, D, S & M acted as lead counsel for all the plaintiffs and in this capacity was primarily responsible for preparing most of the pleadings and memoranda, for coordinating all the various single and joint activities of the plaintiffs' counsel, for collecting the information undergirding the settlement proposals, for orchestrating the settlement negotiations with the multiple defendants, and for executing the settlement agreements. A lengthy discussion of the skill and experience shown by the firm in this litigation is unnecessary since its excellent reputation in this field precedes it, and based on the court's frequent observation of its work, the firm demonstrated here that this reputation is well deserved. If the courts could somehow be sure that attorneys of this caliber would always be available to prosecute private antitrust suits, then the private enforcement of the antitrust laws envisioned by Congress would be a reality, rather than the popular myth it is today. The members of this firm have vigorously and skillfully represented the whole class, and the outstanding results are due in no small measure to their persistent efforts to secure the best terms for the plaintiffs.

In its application D, S & M states that a total of 15,923.25 hours, 8,645.5 hours of

attorney time, 7,176 hours spent by paralegals, and 101.75 hours by law clerks or summer associates, was spent in prosecuting this litigation on the class' behalf.[3] The normal hourly rates charged by its attorneys for noncontingent work range from $200 per hour for Mr. Shapiro to $60 per hour for a starting associate; law clerks and paralegals normally command $25 per hour. Based on these figures, D, S & M requests a lodestar award of $1,152,521.25, and $95,740.75 in litigation costs. To fulfill its responsibility to the absent class members, the court must assess D, S & M's role in this litigation and endeavor to place a reasonable value upon the firm's contribution to the settlement of these cases. Because the individuals assigned to this litigation possess varying degrees of skill and experience, and since each assumed different levels of responsibility for the completion of this work, it will be necessary to isolate and examine the benefit each individual conferred upon the class.

### David I. Shapiro

Though lead counsel was never officially designated, Mr. Shapiro was generally recognized as the leader of the plaintiffs' counsel; throughout the litigation, negotiation, and administrative stages of these cases he has occupied a, if not the, pivotal position. As the senior participant of the workhorse firm, Mr. Shapiro skillfully steered these suits through the many twists and turns they took during the five years from their commencement to settlement. On several occasions he acted as the plaintiffs' spokesman in court. Mr. Shapiro is also one of the members of the Settlement Administration Committee, whose responsibility it is to ensure that all the terms of the various settlement agreements are honored and that the claims filed against the settlement fund are verified and considered. Mr. Vickery, the plaintiffs' expert witness on attorneys' fees, testified that based on his knowl-

edge of Mr. Shapiro's skill, reputation, and standing in the plaintiffs' antitrust bar and on his personal experience in working with and against him, he considered Mr. Shapiro to be the absolute top of the plaintiffs' antitrust bar. Mr. Vickery further testified that the $200 per hour charge Mr. Shapiro normally charges for noncontingent cases was if anything too low for the skill and experience he lends to each case.

The court is persuaded by this testimony and its observation of Mr. Shapiro during the prosecution of these suits that he possesses unusual skill and creativity in this field and for this reason will use the highest hourly rate to be awarded in these suits to compute the lodestar component of his fee. According to his application Mr. Shapiro spent 1,766.5 hours litigating these suits on the plaintiffs' behalf. The overwhelming majority of this time, approximately 1,287.5 hours, was devoted to the consultations with other attorneys and parties leading up to the drafting, consummation, and approval of the settlement agreements, tasks which the court considers of the highest priority and therefore to be compensated at the highest rate of $150 per hour. With the exception of 87.5 hours expended, in the court's estimation, on the behalf of D, S & M's clients and not for the benefit of the plaintiffs as a whole, the court values the remaining hours at the same hourly rate of $150. The lodestar award to Mr. Shapiro thus comes to $251,850.00.

### Arthur J. Galligan

Mr. Galligan requests a lodestar award of $146,406.25, derived by multiplying the 1,171.25 hours he has spent by his customary noncontingent rate of $125 per hour. Pursuant to Settlement Order No. 2, entered March 28, 1978, the Settlement Administration Committee was established, with Mr. Galligan, an acknowledged expert at administering class action distributions, as chairman. For the most part his involve-

---

**3.** The court notes that D, S & M inadvertently triggered the most favored nations clause contained in one of the settlement agreements. At the time this error was discovered, the court intimated that the time spent correcting the mistake could not be charged to the class. Mr. Shapiro explained to the court's satisfaction at the hearing that these hours were excluded from the firm's fee application and that the firm would receive no compensation whatsoever for this time. The court respects Mr. Shapiro for accepting full blame for this oversight.

ment in this litigation was limited to performing the more mundane administrative work entrusted to this committee—for example, investing portions of the settlement fund, preparing a mailing list, establishing procedures for processing claims—but the court recognizes the unusual skill, imagination, and experience he brings to this endeavor, and the importance of this phase of the litigation to the overall speedy conclusion of these cases. Without the services of an experienced and conscientious administrator such as Mr. Galligan the squabbles among the plaintiffs over the proper procedures for notifying prospective claimants, receiving, cataloguing, and verifying claims, and distributing proportionate shares of the fund to the proper parties could unnecessarily prolong the creation and distribution of the fund, to everyone's detriment. For the 1,048.75 hours spent in this line of service the court feels that a rate of $125 per hour is fair and reasonable; the remainder of his time, 122.5 hours, will also be valued for lodestar purposes at $125 per hour. Mr. Galligan's lodestar award, then, totals $146,406.25.

### James van R. Springer

Mr. Springer apparently is the chief wordsmith of D, S & M, though he was assigned to this litigation to do much more than draft briefs. He spent a total of 635 hours, with only about a third of these devoted to preparing, revising, or reviewing court papers. Mr. Springer normally bills his time at $125 per hour, a rate that Mr. Vickery considered to be extremely reasonable in light of Mr. Springer's skill, experience, and reputation. Under the circumstances here the court concludes that a reasonable hourly fee is $115. Multiplying this figure by the number of hours expended—excluding 6.5 hours that the court feels inured to the class' benefit in only the most indirect way—the court arrives at a lodestar amount of $72,277.50.

### Other Partners

Several other partners in D, S & M, namely Messrs. Polk, Treadway, and Dickstein, contributed some of their time to this worthy cause, time that the court should recognize before computing the fee award to the firm. Mr. Treadway, one of the firm's corporate specialists, for example, assisted in the critical task of analyzing the notes and the security given by the defendants and their financial statements, without which the plaintiffs could not possibly have moved through the settlement to the administration stage. These partners' accumulated time is 120 hours, 96 hours of which the court concludes were spent on work benefiting the whole class. Their normal hourly rates range between $150 and $100. The court, however, concludes that a reasonable hourly rate for this stage of the calculation is $115, leaving a lodestar award of $11,040.00.

### Joel Kleinman

If Mr. Shapiro was the field commander, then just as surely Mr. Kleinman was his trusted foot soldier. No one attorney, and with one exception no firm, spent more time working on this litigation than he, 4,345.25 hours in all. His duties stretched the full spectrum of chores involved in each phase of the litigation, from discovery on the class certification issue to research on the questions of liability to some aspects of settlement administration. In reviewing the number of hours he spent, however, the court notes that as a matter of principle a fair and reliable assessment of an associate's contribution to the successful result here is more difficult since to a limited extent the use of associates for other than the more routine tasks is inefficient. Generally, an associate will take longer to complete an assignment, and his work will usually have to be reviewed and sometimes revised by his seniors, but the court would not want to indirectly discourage firms from using associates to perform tasks of this nature by sharpening its pencil on an associate's fee application. An opportunity such as one offered Mr. Kleinman to concentrate on a complex piece of litigation from a tenuous start to a successful finish should not lightly be denied a rising associate if the courts are the least bit concerned about the quality of the trial bar. Mr. Kleinman's rapid maturation as an attor-

ney, acknowledged by D, S & M and reflected in the greater responsibility given him in this litigation, is at least partially due to this opportunity.

D, S & M states in its application that over the course of the litigation Mr. Kleinman's customary hourly rate has increased from a low of $60 in 1974 to $75 from January 1, 1975 to June 30, 1977, to $85 since July 1, 1977, as he matured and thus became more useful to the firm. Taking into account his rise in the firm's hierarchy, and pay scale, Mr. Kleinman requests a lodestar award of $329,486.25.

Of all the hours listed by Mr. Kleinman, the court has disallowed only 53 hours spent early in this campaign on general research that was unrelated to the course this litigation ultimately assumed. The court feels that the remaining 4,292.25 hours should be compensated at a mixed rate of $65 per hour, which takes into account the skill and experience he acquired while assigned to these cases. Mr. Kleinman's lodestar award, then, is $278,996.25.

### Other Associates

D, S & M periodically called in several other associates to share the workload with Mr. Kleinman, often for assignments when their field of expertise might be helpful. They spent a total of 607.5 hours, primarily in preparing court papers, researching, and completing administrative tasks necessitated by this multi-case litigation. Their normal billing rate ranges between $60 and $85 per hour, and their lodestar request totals $47,784.50. Of the hours listed for these associates, the court has identified and stricken 24.5 of these hours that in the court's opinion were spent furthering the more specific interests of their own clients or were duplicated by others. Applying what it feels to be a reasonable hourly rate of $60, the court derives a lodestar of $34,980.00.

### Local Counsel

James C. Wood was retained by the Attorney General of Alabama to assist D, S & M as local counsel for that state. He states that in this role he spent 149 hours helping D, S & M collect information, prepare for depositions, and conduct settlement negotiations, all of which time he would normally bill at $75 per hour. Having reviewed his application, the court, however, disagrees that all these hours benefited the class as a whole; while every increment of time spent catering to a specific client or subclass may cumulatively improve the lot of the whole class, the court, in figuring his contribution to the outcome of these cases, does not intend to consider work that only remotely or indirectly benefits the class. Of the 149 hours listed, 38.5 of these clearly were not committed to the creation or pursuit of any class advantage but were spent for the sole purpose of furthering the similar but more narrow interests of his client. At $65 per hour, which the court feels is a reasonable rate of return on the time spent operating in such a limited role, his lodestar total comes to $7,182.50.

### Paralegals and Law Clerks

D, S & M's paralegals and law clerks spent a combined total of 7,277.75 hours working on all phases of this litigation. By way of support for this portion of their fee request, D, S & M congratulates itself for what it considers to be a less costly and more efficient use of support personnel to perform tasks that do not require the special education and experience—nor the expense—of a full-fledged attorney. In the not so distant past the court would have frowned upon the practice of billing paraprofessional time separate from attorney time just as it might if a firm separately recorded and billed the hours spent by a secretary on a specific client, *see City of Detroit v. Grinnell Corp.,* 560 F.2d 1093, 1095 n. 2 (2d Cir.1977), but the standing of paraprofessionals has improved significantly as special training has enabled them to undertake a wide variety of more sophisticated tasks previously assigned exclusively to higher priced lawyers. The advent and widespread use of the paraprofessional has meant that the cost of effective legal counsel has been reduced and its availability enhanced without impairing the quality or delivery of legal services. Courts awarding attorneys' fees have a unique opportunity

to encourage the use of paraprofessional help in the areas where it might prove invaluable by permitting a firm to recoup its cost. The standard to be used here in assessing the hours billed by paralegals is the same, however: only the time necessarily devoted to this litigation on projects related to the common interests of the class and not duplicated by others will be figured into the court's calculations. As for the hourly rate of compensation, the court has reviewed several cases of a similar nature and of equal complexity in which paralegal time has been remunerated on an hourly basis and concludes that $25 per hour is a fair and reasonable rate of compensation. D, S & M's paralegals logged 7,176 hours working at a variety of jobs, but for the most part they concentrated on preparing the class action notice, responding to discovery requests, and performing other chores pertaining to settlement administration. Of this total the court has excised 57 hours spent conducting very general research on issues that did not figure significantly into this litigation. The lodestar award for D, S & M's paralegals, then, comes to $177,975.00.

The law clerks and summer associates spent a total of 101.75 hours on this litigation, most of which was devoted to researching and writing legal briefs. The court feels that due to their professional training, although not quite completed, the law clerks sit a notch above the paralegal and their time should therefore be compensated at a slightly higher rate. Under the circumstances the court believes that $35 per hour is a reasonable value for their services. Thus, their lodestar award totals $3,561.25.

The lodestar award for D, S & M's attorneys, law clerks, paralegals, and local counsel then comes to $984,268.75.

*Liaison Counsel: Messrs. Vickery and Bondurant*

The spokesman for all the plaintiffs in this litigation was liaison counsel, whose principal responsibilities were to pull the divergent views expressed among the plaintiffs together for a unified, persuasive presentation to the court and to coordinate the work of the numerous, far-flung firms. As the plaintiffs' conductor, he was to attempt to blend the cacophony of voices into a melodic chorus, one capable of soothing the defendant and transfixing the court. To perform this task liaison counsel had to keep abreast of all the developments in this litigation and in others whose outcome might affect the disposition of the plaintiffs' claims. The plaintiffs were blessed with two experienced and esteemed antitrust attorneys, Messrs. Vickery and Bondurant. Mr. Vickery first undertook this chore in 1974, while a member of the Atlanta firm of Jones, Bird and Howell. In return for his services, the plaintiffs' counsel agreed to compensate Mr. Vickery's firm for all the time he spent on this litigation, whether they were successful or not, at his customary billing rate. After spending 1,237.1 hours, Mr. Vickery was forced to withdraw in the fall of 1975, when he left Jones, Bird and Howell to join Hansell, Post, Brandon and Dorsey, which happened to be acting as local counsel for one of the defendants. Multiplying these hours by its historical rates, the firm requests a fee of $54,251.50. If the court should award less than this amount, the plaintiffs' counsel have agreed to make up the difference on a pro rata basis. As the firm's application stands now, however, the court does not intend to award any fee from the settlement fund, even though it acknowledges that Mr. Vickery performed valuable services benefiting the whole class. The court may only award fees in this litigation to the extent of the reasonable market value of the attorney's input into the creation of the settlement fund; without some indication of how and on what an attorney spent his time, the court has no basis for saying that the applicant contributed to the settlement of these cases. The court is not adverse to awarding attorney's fees to Mr. Vickery's former firm, and it recognizes that liaison counsel is in effect class counsel, but until the court is supplied with the proper records, no action will be taken on this application.

When Mr. Vickery withdrew, the plaintiffs' counsel quickly retained Mr. Bondurant to replace him. While Mr. Bondurant also switched allegiances during his tenure as liaison counsel, this change did not force a premature retirement from this position; it only increased his noncontingent hourly billing rate. As a member of the firm of Kilpatrick & Cody, Mr. Bondurant expended 525.5 hours on these suits; later, as a founding partner of the new firm of Trotter, Bondurant, Griffin, Miller & Hishon, he spent an additional 406.4 hours.[4] For the hours spent consulting with the other attorneys and parties, negotiating the settlement agreements, and preparing for and representing the class in court, which according to the court's calculations total 583.8, the court feels that an hourly rate of $125 is appropriate, since this time was devoted to tasks of critical importance to the settlement of these cases. Of the 348.1 hours remaining, the court has eliminated 34.2 hours spent in the early going when Mr. Bondurant was acquainting himself with what had transpired until Mr. Vickery's unexpected departure; in the court's opinion, these hours were not related to any direct benefit shared by the class for which it should be charged. To the balance, 313.9 hours, the court also assigns an hourly rate of $125. Mr. Bondurant's lodestar award then comes to $112,212.50.

Messrs. Swann and Alexander, partners of Mr. Bondurant at Kilpatrick & Cody, logged a total of 58.3 hours assisting him in this litigation. Of this amount the court disallows 30.5 hours for the same reason set forth above. At what the court feels is a reasonable hourly rate of $100, their lodestar award is $2,780.00.

Mr. Bondurant also enlisted the help of several associates from both firms. Their combined time in this litigation is 339.5 hours. The court feels that a reasonable rate of compensation for this mixture of associates is $50 per hour. As a result, the associates' lodestar equals $16,975.00.

Paraprofessionals from both firms also performed a wide variety of indispensable services on the class' behalf. The court has already discussed the instrumental role played by paralegals in the modern law firm and need not reiterate those observations here. Suffice it to say that by easing the workload on the attorneys, paralegals ensure that a client will receive more efficient, less expensive legal service, without diminishing its quality. The total number of hours claimed by these paraprofessionals is 723.8. The court, however, has eliminated 48.9 hours spent when Mr. Bondurant first entered this litigation on administrative tasks such as familiarizing themselves with the filing system; while it was certainly important that Mr. Bondurant's paralegals understand the system devised by Mr. Vickery, the court does not feel that it would be appropriate to charge the class for this time. Accordingly, multiplying the remaining hours by the standard hourly rate of $25 used by the courts for paralegal time, the court arrives at a lodestar award of $16,872.50.

The lodestar award to Mr. Bondurant on behalf of Kilpatrick & Cody and Trotter, Bondurant, Griffin, Miller & Hishon, then, equals $148,840.00.

*Berger & Montague, P.C.*

Another principal architect of the plaintiffs' successful strategy was the Philadelphia firm of Berger & Montague, P.C. Since filing the first nationwide class action on behalf of all the states, the firm has been extremely active in all phases of this litigation. As testimony to its enviable reputation in antitrust and class action suits, Berger & Montague performed with the same redoubtable skill and foresight throughout the prosecution of these suits. The firm seeks an award for the 5,000 hours it contributed to this endeavor. Having observed several members of the firm in action and being generally familiar with the

---

4. The court disputes the computations done in several parts of this application. In only one instance, though, that of Messrs. Miles and Alexander, was the court's total less than that derived by Mr. Bondurant's mathematician. If the court has erred, then, it is unlikely that he would object.

work it performed, the court is persuaded that Berger & Montague has conferred a direct benefit upon the class for which it should receive compensation from the settlement fund.

### David Berger

As the senior and most experienced attorney in the firm, Mr. Berger limited his involvement in this litigation principally to overseeing the work done by others in his firm, thus keeping his hours to a minimum. During the five years his firm was busy with these suits, Mr. Berger logged only 175.5 hours.[5] He requests that this time be compensated at his customary noncontingent hourly rate of $250, for a lodestar of $43,875.00. The court, however, does not believe that all these hours are compensable under the equitable fund doctrine. Of this total 30 hours were spent on miscellaneous activities, such as reviewing files or consulting with the firm's clients, that did not create any benefit extending to the whole class and therefore should not be charged to the absent, unrepresented class members. The remainder of these hours will be multiplied by a $150 hourly rate, which the court feels is a reasonable rate of return for an attorney of his skill and experience. Mr. Berger's lodestar award, then, comes to $21,825.00.

### H. Laddie Montague, Jr.

The operational responsibility for this litigation fell to the chairman of the firm's antitrust department, Mr. Montague, who of necessity invested considerably more time in prosecuting these cases than Mr. Berger. In several respects Mr. Montague occupied the third seat of the plaintiffs' troika, the other two seats being held by Messrs. Shapiro and Bondurant. Under his seasoned leadership the firm undertook a wide variety of difficult and time-consuming tasks for the benefit of the class, all of

which were performed effectively and efficiently. He himself devoted 708 hours, the majority of which were spent either negotiating the settlement agreements, consulting with the other attorneys involved in this suit, or preparing court papers. Of this total the court has stricken 81.75 hours spent performing either compensable tasks, such as discovery or the review of documents, or non-compensable miscellaneous tasks, none of which inured to the direct benefit of the class. Multiplying the balance of these hours by an hourly rate of $125, the court arrives at a lodestar award of $78,281.25.

### Joel C. Meredith

Mr. Meredith assumed essentially the role of a utility man, performing a wide variety of tasks. Although relatively young when he began work on these suits, he was given a considerable amount of responsibility from the start. He frequently attended the meetings held by the plaintiffs to discuss trial and settlement strategy, and he played a major role in presenting the plaintiffs' positions in court papers and in conducting discovery. Of the 952.16 hours Mr. Meredith spent on these cases,[6] the court, however, has eliminated 86.16 hours that only remotely contributed to the creation of the settlement fund. The remaining 866 hours will be multiplied by a rate of $75 per hour, which the court concludes represents a reasonable market value for Mr. Meredith's services over the time period given his relative inexperience when he began working on this litigation. Therefore, the lodestar award to Mr. Meredith equals $64,950.00.

### Merrill G. Davidoff

Mr. Davidoff almost seems to pick up where Mr. Meredith left off when the latter departed from Berger & Montague to start his own firm. Logging 315.5 hours, he performed essentially the same wide range of

---

5. In its application Berger & Montague list 176.25 hours for Mr. Berger. The court was unable to identify the arithmetic discrepancy and, therefore, after double-checking its computations, used its own figures.

6. The court's and Berger & Montague's calculations do not agree. The court comes up with 952.16 hours, while the firm claims only 951.75 hours. But Berger & Montague's total cannot be correct since the entry on July 2, 1975, is 2.66 hours, one of only two entries expressing fractions of time in thirds. Anyway, the firm is unlikely to object if the court uses its own higher figure.

tasks, although he too was relatively inexperienced when first assigned to this litigation. Sixty-four of these hours, however, are not compensable under the equitable fund doctrine for the same reasons stated earlier: they are not reasonably related to the creation of any benefit extended the whole class. Multiplying the remaining hours by the reasonable rate of $65 per hour, the court derives a lodestar award of $16,347.50.

### Steven J. Greenfogel

Before becoming the chief of Massachusetts' antitrust division and re-entering this fray on the state's behalf as a public attorney general, Mr. Greenfogel spent 1,540.75 hours in this litigation for Berger & Montague. Of this total 50 hours spent in discovery, 68.5 hours devoted to general research, 17.5 hours spent preparing court papers, 135 hours allocated to miscellaneous tasks such as reviewing files, and 26.5 hours devoted to the firm's clients did not go towards conferring any benefit upon the class and therefore are not compensable. Taking into consideration Mr. Greenfogel's inexperience at the start of his involvement in this litigation and his concentration on routine research and writing assignments, the court feels that $55 per hour will reasonably approximate the value of his contribution to the class for this phase of the computations. His lodestar award, then, is $68,378.75.

### Robert S. Balter

Of the 190.25 hours spent by Mr. Balter, the court concludes that only the 1.75 hours spent on the application for attorneys' fees and the 5 hours devoted to miscellaneous tasks are noncompensable. The remaining hours, largely devoted to research and writing, will be multiplied by an hourly rate of $65, which the court feels is a reasonable hourly fee for work of this character by an attorney of his skill and experience. The lodestar award to Mr. Balter thus comes to $11,927.50.

### Richard Eppinger

Mr. Eppinger logged 395.25 hours in this litigation, the majority of which were spent preparing memoranda and court papers, conducting research, and completing discovery. Of this amount 50 hours were devoted to activities that did not create any benefit shared by the whole class and therefore have been eliminated from this computation. The court feels that a reasonable hourly rate for an attorney of like experience performing similar tasks would be $55; the lodestar award to Mr. Eppinger is $18,988.75.

### Other Attorneys

Berger & Montague assigned a number of other attorneys limited tasks to perform in these cases. Harold Berger, Warren D. Mulloy, and Stanley R. Wolfe, though three of the top attorneys in the firm, participated only briefly in this litigation; their total combined involvement comes to only 29 hours. Of this total the court deems that 2.75 hours should be stricken on the now familiar refrain—these hours only remotely contributed to the creation of the settlement fund. The remaining 26.25 hours will be multiplied by an hourly rate of $125, a reasonable rate under the circumstances for attorneys of their stature. The lodestar award to these three then equals $3,281.25.

A host of younger attorneys—Daniel Berger, Eugene V. Lipkowitz, Roger J. Bernstein, Bruce Cohen, Alan C. Kessler, Bruce Schwartz, Phyllis Kaufman, and Joan A. Zubras—made only a marginal commitment to this litigation, a total of 79 hours. In computing this element of their fee award, the court has excised 2.0 hours that did not go towards conferring any benefit upon the class. The court has also eliminated all the hours claimed by Daniel Berger and Phyllis Kaufman and all but 1.5 hours attributed to Eugene V. Lipkowitz on the ground that the records do not adequately disclose how this time was spent and the court has no personal knowledge of their role in this litigation. The remaining hours, 46 in number, will be multiplied by a rate of $55 per hour, which the court feels is reasonable under the circumstances. The lodestar award to this group of attorneys then is $2,530.00.

982

### Paralegals and Law Clerks

Berger & Montague's paralegals spent a total of 398.8 hours on these cases.[7] The court, however, has eliminated the 32.5 hours spent preparing the firm's fee petition, thus leaving 366.3 hours. At the standard rate of $25 per hour, the lodestar award to the firm's paralegals comes to $9,157.50. Berger & Montague also employed a number of law clerks during the course of this litigation. They spent a total of 181 hours, of which the court has stricken 1.5 hours of general research only remotely related to the creation of the fund. Multiplying the compensable hours by the $35 per hour fare, the court arrives at a lodestar of $6,282.50.

### Local and Associate Counsel

Pursuant to the local court rules then in effect, Berger & Montague retained local counsel for the cases filed in this court. For the class action filed on behalf of all the states, the firm retained Edward Savell of Savell, Williams, Cox & Angel. In this capacity the firm spent a total of 148.78 hours. However, because the time records submitted to the court do not reveal which attorney performed each task and how long it took, and are therefore incomplete, the court will not make an award of attorneys' fees at this time. The court does not dispute that in this limited role local counsel may confer benefits upon the class for which he should receive compensation, see *Hartford Hospital v. Chas. Pfizer & Co., Inc.*, 1972 Trade Cas. (CCH) ¶ 74,112 (S.D.N.Y.1972), but local counsel is subject to the same rule that all investments of time must be documented before the court will award fees from the settlement fund. Accordingly, the court will defer consideration of this petition until the applicant has had an opportunity to supplement its request.

John Dunaway spent 125 hours as local counsel in the *Migliaccio* suit. Of this total the court has eliminated 46 hours that Mr. Dunaway spent while acting essentially as a clearinghouse for all the papers filed in

these cases. He states that his normal billing rate for work of this nature is $75 per hour. The court agrees that this is a reasonable rate under the circumstances, and, therefore, the lodestar award to Mr. Dunaway equals $5,925.00.

Mortimer Wolf, who along with Harold Brown, and ultimately Berger & Montague, acted as co-counsel in the *Migliaccio* and *Grammas* cases, unexpectedly died before the settlement of these cases and before complete records of his time were compiled. Berger & Montague state that before his death he spent 40 hours on these cases and that an associate spent 8 hours. On the strength of Berger & Montague's word and based on the court's familiarity with the extent of his participation in these cases, the court awards Mr. Wolf's estate a lodestar of $3,640.00, representing 40 hours at a rate of $90 per hour and 8 hours at a rate of $50 per hour.

In summary, the lodestar award to Berger & Montague, P.C., comes to $311,515.00.

### Specks & Goldberg, Ltd.

In November, 1974, Ambassador East Hotel, represented by Specks & Goldberg, filed an antitrust suit on behalf of a nationwide class of hotels, motels, restaurants, fast food establishments, and institutional and contract feeders. Several months later, Specks & Goldberg moved to intervene in *Ambassador East* on behalf of other hotels, fast food establishments, and restaurants. From this point on the firm lent its considerable skill and experience to the plaintiffs in all phases of the litigation. As sole counsel for the hotels, motels, restaurants, and institutional and contract feeders and co-counsel for all present and former franchisees of Kentucky Fried Chicken and/or Chicken-Unlimited, it was especially active in certain of the settlement negotiations and helpful in obtaining customer information from non-defendant chicken processors, in compiling a list of wholesaler/distributor class members, and in developing damage theories and trial and settlement strategy.

---

7. The court's calculation differs from that of the firm. Berger & Montague claims only 386.-25 hours. While the court may be in error, it is unlikely that Berger & Montague's computation is altogether correct either since one entry, by Barbara McCabe, was for 6.3 hours.

In stark contrast with the wide range of chores undertaken by the firm and with the number of hours expended by other firms carrying the major workloads in this litigation, Specks & Goldberg claims a modest number of hours, a total of 980.75, and requests a lodestar of $368,325.00.

### Granvil I. Specks

Of this total almost half the hours were logged by Mr. Specks, one of the leading figures throughout this litigation. Mr. Specks was a vigorous and effective advocate for the plaintiffs; besides being instrumental in wringing from the defendant the favorable terms contained in the various settlement agreements, on which project he spent more than half the time he accumulated on these cases, he also served as a member of the Settlement Administration Committee. His outlay of time totals 395.5 hours.[8] The court concludes, however, that 28.75 of these hours did not translate into a benefit flowing directly to the class and therefore should be stricken. Mr. Specks' customary hourly rate is $150, but under the circumstances here the court deems $125 to be a reasonable hourly fee. The lodestar award to Mr. Specks is therefore $45,843.75.

### Perry Goldberg

Another stalwart from this same firm is Mr. Goldberg, whose considerable experience and skill in antitrust litigation inured directly to the plaintiffs' advantage. Mr. Goldberg claims 239.25 man-hours in this litigation, but where Mr. Specks' mathematician overstated his hours slightly, Mr. Goldberg's underestimates his role. The entries in his records come to 248.75 hours. The error was apparently made in adding the figures listed for December, 1974; the total, computed as 21.5, should be 31.0. This increase on paper is of no consequence, though, since the court has deleted 17.75 hours spent pressing his client's special interests. Multiplying these hours by the

$125 per hour rate selected by the court, the court derives a lodestar award of $28,875.00.

### Associates: Gary Specks and Alan Freedman

Messrs. Specks and Freedman spent a total of 336.5 hours, of which the court has excised only 2.5 hours spent for what it considers to be a redundant review of court papers. They both cite $75 per hour as their customary billing rate for noncontingent cases. The court, however, feels that $75 an hour is not a reasonable rate to charge absent, unrepresented class members for the time of a young associate who was fresh out of law school when he began working on this litigation. Under the circumstances the court feels that a fair and reasonable result can be reached by figuring all the time the two spent over a period of several years at an hourly rate of $60. Their lodestar amount, then, must be reduced from the requested $25,237.50 to $20,040.00.

### Associate Counsel

Given Specks & Goldberg's relatively small size and the complexity of the cases they routinely undertake, it is not surprising that the firm might call in local counsel to carry part of their workload. For this litigation Specks & Goldberg retained the firms of Wald & Wald, Portman & Portman, and Speer, Herzog & Ponfil, all of which have had some prior experience in antitrust litigation. Because these firms kept such a low profile during the course of this litigation, the court knows very little about the services they performed other than what it might glean from their applications, but there is no reason to treat their requests for attorneys' fees any differently from those submitted by more prominent firms whose applications included the time spent by attorneys who worked diligently but in the background on less glamorous tasks. The joint application of Portman &

---

8. The court takes issue with Mr. Speck's arithmetic. He lists 411.0 hours, but by the court's count of the entries in the firm's time records, he actually billed only 395.5 hours. The errors appear to be in the monthly totals for January, 1975, and April, 1977. For January, 1975, the

entries total 8.5 hours, whereas Mr. Specks only gave himself credit for 6.5 hours. For April, 1977, the monthly total is 27.25 hours, but the column of figures adds up to only 9.75 hours.

Portman and Speer, Herzog & Ponfil, however, does not itemize the time by date and specific chore but cumulates their man-hours under one heading, including in this general description conferences with their client and responses to discovery requests. The court is without authority to compute a lodestar award upon this scant documentation since the foundation for the fee award is the court's equitable power to spread the reasonable costs of prosecuting these suits among the beneficiaries of the fund created by counsel's efforts. As this application stands, the court is unable to distinguish between the time spent furthering their own client's interests and those of the plaintiff class. Accordingly, the court allows Portman & Portman and Speer, Herzog & Ponfil a reasonable time to submit a more detailed accounting of the time alloted to this litigation.

As for Wald & Wald, the firm spent a total of 64.25 hours in this litigation.[9] Of this total the only entry to be disallowed by the court is the half hour spent by Mr. B. Wald on March 31, 1976, searching unsuccessfully for several of the plaintiffs' answers and objections to the defendants' interrogatories; the court sees little benefit flowing to the class from that exchange. The customary billing rate for Messrs. J. Wald and Schein is $125 per hour, while Mr. B. Wald's rate is $75 per hour. The court feels that $100 per hour is a reasonable rate to be applied to their application. The lodestar award, then, is $6,375.00.

In summary, the lodestar awarded to Specks & Goldberg and associated firms is $101,133.75.

*Freeman, Rothe, Freeman & Salzman*

Representing the State of Illinois and Kentucky Fried Chicken of Mattoon, Illinois, is another firm distinguished in the art of prosecuting antitrust suits and complex class actions, Freeman, Rothe, Freeman & Salzman. The firm participated in all the significant strategy meetings and was especially active in several of the settlement negotiations. For the skill, experience, and labor it devoted to this endeavor the firm can certainly claim some responsibility for the favorable outcome. To its credit, Freeman, Rothe, Freeman & Salzman was able to discharge its responsibility to its clients and complete the work assigned to it by the plaintiffs' ad hoc legal committee without investing a substantial number of hours; its total, including the hours spent by associate counsel, comes to only 794.05 hours.[10]

*Lee A. Freeman*

Only a small fraction of this time, 57 hours, was logged by the senior member and most experienced trial attorney in the firm, Mr. Lee Freeman. Mr. Freeman did not make many appearances during the course of this litigation but instead delegated most of the authority for representing the firm's clients to other able members of the firm. Much of the time he devoted to this litigation was instead spent conferring with the members of his own firm who had assumed a more active role in these cases, but the court is well aware that the time spent exchanging ideas and information in the conference room may be invaluable and that some of Mr. Freeman's suggestions inevitably found their way into the plaintiffs' strategy and arguments. Some of Mr. Freeman's time, however, was spent in settlement related activities. Under the circumstances the court feels that a rate of $125 per hour is fair and reasonable. The lodestar award to Mr. Freeman then comes to $7,125.00.

9. This figure includes the 46.25 hours spent by Mr. Schein, who is associated with the firm of Wald & Wald.

10. That is, by the court's count. The firm arrived at a higher figure, 806.5 hours. The discrepancy appears to be the result of two conflicting accounts of the time Mr. Meyer spent on this litigation and of what is apparently an erroneous summation of the firm's total time.

The firm lists his total time at 124.5 hours. In a letter addressed to Mr. Salzman, however, Mr. Meyer claims only 111.5 hours, a difference of 13 hours. When this differential is added to the court's figure, this total becomes 807.05 hours, which is exactly what the court gets when it adds all the numbers in the hours' columns on pages 12–14 of the firm's application.

### Lee A. Freeman, Jr.

Mr. Lee Freeman, Jr. logged only 13.5 hours in this litigation. His normal hourly rate for all but 2.5 hours of this total is listed as $100.00. The court, however, feels that a rate of $85 per hour will reasonably approximate the lodestar value of his contribution to the settlement of these cases. Accordingly, this component of his award equals $1,147.50.

### Jerrold E. Salzman

The workhorse of the firm on this project and one of the leading figures in this litigation was Mr. Salzman. Many of the good deeds credited to the firm during the long course of the litigation were the product of his work. Besides being a member of the plaintiffs' ad hoc settlement committee, Mr. Salzman was instrumental in conducting the discovery on the class certification issue, which was winding up about the time the last defendants settled. Indeed, Mr. Vickery, a noted trial attorney himself, testified at the hearing held on November 19, 1979, that he was impressed by Mr. Salzman's legal acumen. He accumulated a total of 335.8 hours, which if billed at his customary hourly rate would have been compensated at anything between $75–$135 per hour, depending upon the time frame selected. In recognition of his skill and experience and of the hard work he contributed, the court concludes that a rate of return of $115 per hour for all the time he devoted to this litigation is reasonable. The court, however, does not feel that all these hours should be charged to the class. Of the 335.8 hours, 49.6 were spent on what the court believes are noncompensable services: either what seems to be unnecessary or cumulative reviews of documents and court papers, work for the firm's clients, or simply miscellaneous activities. Striking these hours, the court derives a lodestar award of $32,913.00.

### Associates: Messrs. Harris, Seefried and Malysiak

Messrs. Harris and Seefried spent a combined total of 205.75 hours, primarily researching and preparing papers to be filed in court. For these services the court feels that a reasonable hourly rate for these young associates is $50. Accordingly, the lodestar award to the two is $10,287.50.

Mr. Malysiak spent a majority of his total time of 70.5 hours preparing for and responding to discovery requests. Before computing his lodestar award, the court concludes that the 1.5 hours spent organizing the files and reviewing the Fifth Circuit's *United States v. NBMA* decision should be eliminated on the ground that these hours did not go towards creating any appreciable benefit for the class. Multiplying the remaining hours by what the court feels to be a reasonable rate of $60 per hour, the court awards a lodestar of $4,140.00.

### Associate Counsel: John P. Meyer

After Mr. Freeman agreed on behalf of his firm to represent the State of Illinois in this matter, he retained Mr. Meyer as associate counsel to assist the firm primarily in collecting information about the poultry market and the purchasing patterns of some of the plaintiffs and in researching various legal issues. In performing these assignments, Mr. Meyer spent a total of 111.5 hours. Of this total the court has decided to eliminate the 2.5 hours spent traveling to the reporting agency and copying records, both of which could only indirectly benefit the class, and to compute separately the 1.5 hours spent by his associate. Mr. Meyer normally bills his time at $85 per hour, which under the circumstances the court feels is a reasonable hourly rate for the computation of his fee award. His associate's 1.5 hours will be compensated at a rate of $50 per hour. Mr. Meyer's lodestar award then comes to $9,212.50.

In summary, the lodestar award to Freeman, Rothe, Freeman & Salzman equals $64,825.50.

### Carlton, Fields, Ward, Emmanuel, Smith & Cutler

It was not until the firm of Carlton, Fields, Ward, Emmanuel, Smith & Cutler [C, F, W, E, S & C] filed suit on May 7, 1976, on behalf of Wm. Altus & Sons, Inc., representative for the wholesaler class, that

the court had before it all levels of distribution in the broiler industry and would have been in a position to grant complete relief had the plaintiffs prevailed on the merits. While the firm proved to be a vigorous and effective advocate for the plaintiffs' interests throughout the litigation, its major contribution was the preparation of the class notice. Pursuant to the settlement agreements, notice had to go out to all direct purchasers of broilers. C, F, W, E, S & C collected on a massive national basis the names of the class members who were to be notified and prepared the master mailing list. Through formal and informal discovery techniques, the firm obtained the names and addresses of all the direct purchasers from non-defendant slaughterers, which task consumed the majority of the time the firm spent in these suits.

### James M. Landis

Of the members of the firm involved in this litigation, the busiest was Mr. Landis, who spent a total of 1,425.4 hours,[11] 847.6 of these on the class notice. He demonstrated considerable skill and imagination in directing his firm's efforts in this mammoth, indispensable task of compiling a comprehensive mailing list, and for this reason the court concludes that these hours should be compensated at an hourly rate of $100. Mr. Landis also serves as a member of the Settlement Administration Committee and therefore will continue to have a hand in the final stages of this litigation. The remaining hours, 577.8, also will be multiplied by a rate of $100 per hour, leaving a lodestar award of $142,540.00.

### Associates

Over the course of this litigation, the firm assigned a number of associates to assist Mr. Landis. They billed a total of 237.2 hours in performing a wide variety of jobs; their normal hourly rates for noncontingent cases range between $50–65. For their contribution to the settlement of these cases, the court believes that an hourly rate of $55 will be fair and reasonable. The lodestar to C, F, W, E, S & C's associates then comes to $13,046.00.

### Paralegals

The court has previously discussed the enhanced value of trained paraprofessionals in modern litigation and therefore will not comment further here. C, F, W, E, S & C's paralegals spent a total of 940.5 hours on these suits, the overwhelming majority of which were spent in preparing the class notice. At the customary rate of $25 per hour this lodestar equals $23,512.50.

### Paul L. Pascal

By order of June 29, 1978, the court allowed intervention in the wholesaler class by a party represented by Mr. Pascal. For the 6.75 hours he subsequently spent in these cases, the court feels that $85 per hour is a reasonable rate of compensation. His lodestar award then is $573.75.

Therefore, the lodestar award to Carlton, Fields, Ward, Emmanuel, Smith & Cutler comes to $179,672.25.

### States of Pennsylvania, New Jersey, and Massachusetts

On behalf of their respective states, the Attorney Generals of Pennsylvania, New Jersey, and Massachusetts request lodestar awards totaling $330,121.24 for the 2,197.55 hours spent representing the class. This dollar amount was derived by multiplying the total number of hours spent times hourly rates ranging from $90 per hour for the most experienced Deputy and Assistant Attorney Generals to $50 for the younger, less experienced attorneys. Though they normally keep running totals of the number of hours spent on each of their cases, these lawyers do not bill the state for their time as do private attorneys their clients. Moreover, they do not carry the same overhead that private firms do; it is not unusual for a state to bill its legal department for its office space and supplies at prices the department has no say in establishing. Nor do public attorney generals command as high a salary as do private lawyers. Assuming, for good reason, that the quality of services provided by a state attorney is comparable to that performed by private

---

11. Included in this total is the half hour logged by Mr. Ault, a partner with C, F, W, E, S & C.

counsel, the court would not appraise his time at its full market value if it focused exclusively on what his client, the state, normally pays its attorneys. But what then is the reasonable value of their contribution to this litigation? If the court were to ignore the differences between public and private counsel in awarding fees, then the state would receive a windfall in the sense that it will be awarded far more from the settlement fund in attorney's fees than it had to pay to receive these services. Unlike the private attorneys in this litigation, the public attorney generals have been paid a regular salary by their clients throughout the prosecution of these cases. In other actions courts have reduced fee awards to reflect payments from collateral sources such as contingent fee agreements with some clients. *E.g., In re Gypsum Cases,* 386 F.Supp. 959 (N.D.Cal.1974). On the other hand, if the court does not award the full measure of their contribution to the settlement of these cases, then the class will receive a benefit to which, under this analysis, it is not entitled.

In truth, the issue has never been whether public attorney generals should be awarded fees at all. A state attorney representing his state and a subclass of states is just as capable of conferring some benefit upon the whole class as is private counsel occupying essentially the same role. For that matter, state attorneys have been awarded fees under similar circumstances in a number of cases, though it is not unusual for the courts to place a lower value on the contribution of public attorney generals. *E.g., In re Armored Car Antitrust Litigation,* 472 F.Supp. 1357 (N.D.Ga.1979); *In re Master Key Litigation,* 1978–1 Trade Cas. (CCH) ¶ 61,887 (D.Conn.1977); *In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions,* 410 F.Supp. 680 (D.Minn.1975); *Liebman v. J.W. Peterson Coal & Oil Co.,* 1974 Trade Cas. (CCH) ¶ 75,117 (N.D.Ill.1974); *In re Gypsum Cases,* 386 F.Supp. 959 (N.D.Cal.1974). *But see West Virginia v. Chas. Pfizer & Co.,* 1973–2

Trade Cas. (CCH) ¶ 74,749 (S.D.N.Y.1973) (awarded out-of-pocket expenses). And in some cases the courts have refused to apply a risk factor to the lodestar award on the ground that in prosecuting a complex case state attorneys do not assume the same risks of attracting and satisfying clients that private counsel must bear, *e.g., In re Master Key Litigation, supra.* But the issue here has always been what fee would be fair and reasonable to both the class and the state attorneys, not whether a fee should be awarded at all.

The court recognizes that many of the services provided by the public attorney generals conferred appreciable benefits upon the class as a whole. Besides such beneficial chores as working on the Settlement Administration Committee and researching issues affecting the whole class, they performed the very critical function of easing the tensions and overcoming the suspicions between public and private counsel. By maintaining good relations between the two at times when difficult issues threatened to drive them apart, the state attorneys were able to deliver all the states and thus ensure the defendants the total peace they demanded.

Because of the very fundamental differences between private and public attorneys, the court inquired at some length during the evidentiary hearing about the basis for awarding fees to the state from the settlement fund. Of the three states petitioning for attorneys' fees, only New Jersey has thoroughly investigated the per capita cost of operating its antitrust division. On the basis of this analysis, the state concludes that for the years 1976–1979 the cost per attorney hour was $51.88, $80.53, $100.96, and $51.51, respectively. Massachusetts estimates that the per attorney costs of operating its antitrust department during the fiscal year 1979 ran $69.21 an hour; total expenses for this accounting period came to $290,654.00.[12] One possible basis for computing the lodestar of a fee award to the

---

**12.** Nearly 85% of this amount was paid from a Department of Justice grant. The state expects

the federal funds to be depleted by July 1, 1980.

states, then, is the estimated hourly cost of supplying legal services. This formula, however, would arrive at a fair approximation of the market value of the state attorneys' contribution to the class as a whole only if the court were to conclude that because public attorneys possessed less skill and experience, their services were of less value to the class than those performed by private counsel. The court already has valued time spent by private attorneys carrying lesser burdens in this litigation than that assumed by some of these public attorney generals at a rate as high as $125 per hour. Under the circumstances the court concludes that in assigning a value to the time expended by state attorneys for the purpose of computing a lodestar award, it will not distinguish between public and private counsel. The hourly rates selected will reflect the general quality of the public attorneys, their reputation, expertise, and status within the antitrust bar.

### New Jersey

New Jersey entered this litigation by filing a complaint in this court on February 26, 1975. Since that time the state has occupied a pivotal role in the prosecution of all the cases. Apart from the work done on the unitary plaintiff issue, when it established the state's right to bring suit in a representative status without first obtaining class certification under rule 23 of the Federal Rules of Civil Procedure, New Jersey was instrumental in securing the approval from all of the states of the interclass sharing agreement, the importance of which to the plaintiffs' overall strategy the court has previously emphasized. Representatives of its antitrust department were also members of the plaintiffs' ad hoc settlement negotiating committee, and thus active in the settlement negotiations, and of the Settlement Administration Committee.

### Laurel Price

The lion's share of the responsibility for these cases fell upon the shoulders of Mr. Price, the chief of the state's antitrust division. Together with Mr. Greenfogel of Massachusetts, Mr. Price assumed command over all the states involved in this litigation.

As a member of the plaintiffs' negotiating committee and the Settlement Administration Committee, he was especially active in the negotiations leading to the settlement of these cases. In these various roles he spent a total of 419.1 hours, for which at an hourly rate of $90, he requests a lodestar award of $37,719.00. Of this total the court has excluded 81.7 hours spent either representing his client's interests or performing miscellaneous tasks, such as reviewing documents or attending inter-office conferences, that did not confer any appreciable benefit upon the class. Multiplying the remaining 337.4 hours by the requested rate of $90 per hour, which the court finds to be a reasonable rate for an antitrust attorney of his considerable skill and experience, the court arrives at a lodestar of $30,366.00.

### Supporting Personnel

### Deputy Attorney Generals

Mr. Price was assisted by five attorneys from the antitrust division: Messrs. Calmann, Volpe, and Gray, and Mss. Hammer and Prongay. Together they spent 761.9 hours on a variety of tasks ranging from attendance at pretrial conferences and plaintiffs' meetings to general research and discovery requests. For the purposes of computing a lodestar, the court, however, has stricken a total of 84.05 hours. The majority of these hours, 56 to be exact, were logged by Mr. Volpe while conducting what appears to the court to be unnecessarily duplicitous research or attending conferences accompanied by another attorney when the court feels that only one should have been necessary. While it does not mean to criticize the state for its efforts to give the members of its antitrust division valuable experience, the court does not feel that the absent, unrepresented class members should bear the expense of this field training. The balance was spent furthering the state's special interests (17.05) or reviewing papers (11.0), which translated into only a remote, if any, benefit for the class. The court concludes that $60 per hour is a reasonable rate to apply to the time spent by these attorneys, many of which had just completed law school when they began

work on this litigation. The lodestar award to these deputy attorney generals, then, comes to $40,671.00.

### Special Investigator Arthur P. Josephson

Of the 22 hours logged by Mr. Josephson, the court finds that 5.5 hours did not go towards creating any benefit for the class and therefore should be disregarded. Multiplying the remaining 16.5 hours by a rate of $25 per hour, which for the same reasons given earlier in discussing the market value of paraprofessional services is a reasonable rate of return on Mr. Josephson's labor, the court derives a lodestar award of $412.50.

The lodestar award to the State of New Jersey then comes to $71,449.50.

### Massachusetts

Sharing the burden of articulating and defending the states' interests with New Jersey was Massachusetts, which filed its suit against the NBMA and thirty-seven broiler producers on March 25, 1977. Participating in many of the strategy conferences and settlement negotiations, the state deserves the same credit for bridging the gap between private and public counsel and thereby ensuring that the plaintiffs would remain united. According to its time records, the state logged a total of 708.25 hours, all of which were attributed to Mr. Greenfogel, the chief of the Massachusetts antitrust department, and the majority of which were spent consulting with other attorneys and negotiating the settlements.[13] Of this total the court has eliminated the 25.5 hours spent on this fee petition, the 17.25 hours spent examining Mr. Shapiro's affidavit, and 13.0 hours spent reviewing files and documents on the ground that these expenditures of time only remotely benefited the class, thus leaving 652.5 compensable hours. The state requests that Mr. Greenfogel's time be compensated at a rate of $90 per hour. Having concluded

that this is a reasonable hourly value for Mr. Greenfogel's contribution to the class, the court awards Massachusetts a lodestar of $58,725.00.

### Pennsylvania

The State of Pennsylvania, as a class representative, also petitions the court for attorneys' fees. By reference to its attorneys' personal records or by reconstruction, the state estimates that a total of 317.3 hours were devoted to this litigation, all to the benefit of the class: 195.3 hours by Mr. Elman, 50 hours by Mr. Levinson, and 72 hours by Mr. Mathews, a second year law student employed in a paralegal capacity. Of the 195.3 hours claimed by Mr. Elman, the court has eliminated 20.25 hours spent either representing his client or on miscellaneous tasks such as the review of documents and interoffice conferences that did not give rise to any benefit flowing directly to the class. The balance of his hours and those accumulated by Mr. Levinson will be compensated at an hourly rate of $60, which given their limited role in this litigation and the narrow compass of the tasks they undertook, the court finds to be a reasonable rate of return on their investment. Mr. Mathews will receive the standard paralegal fare, $25 per hour. The lodestar award for the State of Pennsylvania then comes to $15,303.00.

### Risk Factor Multiplier

All told, the lodestar awards come to $1,935,732.75. The second and final phase in computing an award of attorneys' fees under the common fund doctrine is to determine whether the lodestar amount, which represents the core value of the attorney's contribution to the creation of this fund, should be enhanced or diminished to reflect the contingencies affecting the attorney's decision to undertake the litigation and the probability of his prevailing on the

---

13. Excluding the hours spent preparing its fee petition, the state claims 677.25 hours of compensable time. Adding all the subtotals in this application, the court, however, arrives at a higher figure, 708.25, which cannot be reconciled with the applicant's figure even after the 25.5 hours spent on the fee petition in September, 1979, are eliminated. After double-check-

ing its arithmetic, the court has decided to use its own computation. Also, in awarding a fee the court is assuming that all these hours were spent by Mr. Greenfogel. In one paragraph of its affidavit in support of its petition the state refers to the time spent "by this office" and then to the time spent by Mr. Greenfogel.

merits of his client's claim. As the court remarked earlier in explaining the lodestar step of this analysis, the real emphasis in calculating attorneys' fees is on the relative risk assumed by those representing the class, since the complexity of the case and the likelihood of success are such important issues in assessing the full value of counsel's effort. Normally before undertaking a suit of unusual risk an attorney will enter into an agreement with his client to share the returns from successful litigation. It is not unusual to find an attorney's share of a money judgment equal to 33⅓% of the client's recovery. Attributing substantial weight to the hourly rate, then, is unfair to the victorious attorneys in a difficult private antitrust suit such as this one when the plaintiffs must overcome substantial odds to prevail. *See Davis v. Fletcher*, 598 F.2d 469 (5th Cir.1979) (per curiam); *Norwood v. Harrison*, 581 F.2d 518 (5th Cir. 1978).

■ In awarding attorneys' fees from a settlement fund under the equitable common benefit doctrine, the courts have gravitated away from the early practice of designating a flat percentage of the fund as the reasonable value of the attorney's services to the fund's beneficiaries, *compare Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 540 F.2d 102 (3d Cir.1976) *with Union Carbide and Carbon Corp. v. Nisley*, 300 F.2d 561 (10th Cir.1961), *appeal dismissed*, 371 U.S. 801, 83 S.Ct. 13, 9 L.Ed.2d 46 (1962), *and Feder v. Harrington*, 58 F.R.D. 171 (S.D.N.Y.1972), and towards this two stage checklist approach. While this analysis is still open to criticism as being overly subjective, the courts have at least identified the factors that should figure most prominently in the court's determination of a reasonable fee, though the factors deemed relevant are not always the same from jurisdiction to jurisdiction and some may be overlapping. *Compare Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir.1974), *with Arenson v. Board of Trade of Chicago*, 372 F.Supp. 1349, 1351–52 (N.D.Ill.1974), *and In re King Resources Co. Securities Litigation*, 420 F.Supp. 610, 628–29 (D.Colo.1976), *and*

*Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 245 F.Supp. 258, 302 (M.D.Pa. 1965), *vacated on other grounds*, 377 F.2d 776 (3d Cir.1967), *aff'd in part, rev'd in part*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), *and In re Osofsky*, 50 F.2d 925, 927 (S.D.N.Y.1931). In *Georgia Highway Express* the Fifth Circuit listed twelve factors to be surveyed by the court before awarding attorneys' fees:

(1) Time and labor required

(2) novelty and difficulty of the issues

(3) skill required to perform the legal service properly

(4) preclusion of other employment due to acceptance of this case

(5) customary fee

(6) whether fee is fixed or contingent

(7) time limitations imposed by client or other circumstances

(8) amount involved and the results obtained

(9) experience, reputation, and ability of the attorneys

(10) undesirability of the case

(11) nature and length of professional relationship with the client

(12) awards in similar cases

Several of these variables have already been quantified by the court in computing the lodestar awards. In totaling the compensable hours and setting reasonable hourly fares, the court has already surveyed the time and labor required, the novelty and difficulty of the issues, the preclusion of other employment, the skill required to perform the legal services properly, the customary fee in cases of this type, and the experience, reputation, and ability of the attorneys. And before deciding whether to adjust the lodestar award to reflect the contingencies, the court will have considered all the remaining factors pertinent to this litigation.

A number of variables contribute to the relative risk assumed by counsel in undertaking the prosecution of a complex antitrust suit. At the time these suits were filed, the plaintiffs' attorneys were aware

of the difficult and novel issues, some of which they realized would be decided at the threshold and would determine whether or not the suits could be maintained at all. They faced the prospect of litigating against able, well-financed defense attorneys for what they could expect to be a long time without any compensation unless and until the suits were brought to a successful conclusion. Unquestionably, the outcome of the litigation could not be foretold at its outset, but the plaintiffs' chances of prevailing on the merits were not encouraging. To begin with, the defendants had compelling reasons to contest these suits vigorously. The National Broiler Marketing Association [NBMA] was organized in September, 1970, as an agricultural cooperative under the Georgia Cooperative Marketing Act, Ga.Code Ann. §§ 65–201 to 65–231, in response to the economic depression and widespread dislocations affecting the whole industry. The organizers' intention was to facilitate the development and exchange of accurate market information so that producers could make intelligent production and pricing decisions. For the most part the members of NBMA, and the cooperating non-members, are large scale, integrated chicken processors selling ready-to-cook chickens to retailers, wholesalers, and large volume consumers. Independent growers, however, owned and operated the chicken farms that supplied the defendant companies with chickens according to contract. The members and the cooperating non-members collected and submitted supply and price information to the NBMA's marketing committee, which then analyzed the data and through a conference call network to the companies recommended prices and production levels on a weekly basis for every major city in which chickens were sold. NBMA staff members and economists later boasted that the increase in the market price for broilers was directly attributable to the NBMA's efforts to coordinate market policy among these competing processors.

In suits filed between March and November of 1974, the plaintiffs challenged the NBMA's conference call network as an unlawful combination and conspiracy to fix, maintain, and stabilize prices of broilers in violation of section 1 of the Sherman Act, 15 U.S.C.A. § 1. In their defense the defendants argued that the NBMA was without the scope of the antitrust laws by virtue of section 6 of the Clayton Act, 15 U.S.C.A. § 17, section 1 of the Capper-Volstead Act, 7 U.S.C.A. § 291, and the Cooperative Marketing Act, 7 U.S.C.A. § 451. The defendants also filed counterclaims alleging that the plaintiffs and unnamed absent class members conspired to artificially depress prices of broilers below the market level to the defendants' injury.

The principal liability issue, and one of first impression under these sections, was whether the NBMA could legitimately claim the statutory antitrust exemption reserved for "farmers" under the Capper-Volstead Act, 7 U.S.C.A. §§ 291–292. The plaintiffs predicated their allegations upon the premise that the NBMA was not entitled to antitrust exemption because integrated chicken processors were not "farmers" since they did not actually raise chickens but entrusted this phase of the operation to independent contract growers and because the NBMA's alleged price fixing and anticompetitive activities were not exempt even for a bona fide farmer cooperative. Under tax and other regulatory statutes, however, analogous issues concerning the dimensions of the statutory concept "farmer" were resolved in favor of integrated producers organized along lines similar to those followed by the defendants here in creating and staffing the NBMA. The plaintiffs' counsel invested considerable time into researching the Capper-Volstead Act issue, but the question was ultimately resolved, with the plaintiffs' assistance as amici, in the suit commenced against the NBMA in April of 1973 by the Antritrust Division of the United States Department of Justice. *United States v. NBMA,* No. 18193 (N.D.Ga.1973). Although they were convinced that as a matter of law the antitrust exemption did not encompass the activities of the NBMA, the plaintiffs fretted over the government's strategy of focusing

so narrowly on several facets of the exemption issue in the fear that if the government lost on this issue, the underpinning of their suit would be eroded by the collateral estoppel effect of the court's decision. The plaintiffs' worst fears were realized when Judge Henderson subsequently upheld the NBMA's defense and dismissed the government's suit. *United States v. NBMA,* 1975-2 Trade Cas. ¶ 60,509 (N.D.Ga.1975). On appeal, however, the Fifth Circuit reversed this decision and was later affirmed on a writ of certiorari by the Supreme Court. *United States v. NBMA,* 550 F.2d 1380 (5th Cir.1977), *aff'd,* 436 U.S. 816, 98 S.Ct. 2122, 56 L.Ed.2d 728 (1978).

Although this decision was several years in the making and therefore did not come until after the plaintiffs had spent considerable time preparing to meet this issue, on the whole it was certainly a net benefit to their cause. There can be no question but that the defendants' hopes of prevailing in this suit waned when the Fifth Circuit and then the Supreme Court struck down their principal defense. Though the outcome of the suit still was not a foregone conclusion, the added momentum given the plaintiffs by this decision apparently was enough to persuade the defendants that there would be no quick, easy, and inexpensive solution to this litigation.

Aside from this decision, however, the government's suit was of little assistance to the plaintiffs. A protective order blocking access to the government's discovery was entered in that case. And although the complaints filed in this litigation were patterned after the allegations made by the government, the plaintiffs here were far more ambitious. In addition to requesting permanent injunctive relief, the plaintiffs also sought class-wide damages alleged to have been caused by the NBMA's anticompetitive activity. They investigated the membership of the NBMA and the participation in the conference call program of non-member producers and, because the NBMA had no financial resources to speak of, ultimately named 41 individual companies defendants in the suit, most of which have contributed to the settlement fund.

So, in addition to having to persuade the court that a national class or classes should be certified, the plaintiffs had to prove that the alleged conspiracy was in fact the proximate cause of their injury, perhaps the most critical component of the determination of liability, or that each was in fact overcharged regardless of the manner of purchase. They then had to devise a theory of damages compatible with market conditions existing at the time of the NBMA's activity.

The class certification issue was of critical importance to the plaintiffs' settlement and trial strategy. The plaintiffs proposed to prosecute these suits as a national class action consisting of all the private and public entities that purchased broilers either directly or indirectly from the defendants during the relevant time period. By banding together with the court's approval the plaintiffs could at least create an appearance of unity and strength and could better finance their challenge to the defendants' activities. Also, acting as one, the plaintiffs could offer those defendants amenable to settlement the total peace they demanded. The defendants, however, vigorously insisted that a national class composed of these purchasers would be unmanageable and should not be certified. They argued that the purchasers composing the plaintiffs' proposed subclasses were situated in different parts of the country; they bought in different regional markets at different times and at fluctuating prices; and they purchased by contrasting methods and in different forms. Some purchased directly from the defendants, while others bought from middlemen or other distributors further down the chain. Some purchased whole chickens, bought in bulk or by negotiated sales, while still others purchased only chicken parts, bought in smaller quantities or at bid sales. In a case as complex and as broad as this one, and one in which issues of individual injury were likely to be prominent, it would not have been unreasonable for the court to deny class certification. *E.g., Shumate & Company, Inc. v. National Association of Securities Dealers, Inc.,* 509

F.2d 147 (5th Cir.), *cert. denied,* 423 U.S. 868, 96 S.Ct. 131, 46 L.Ed.2d 97 (1975).

But even if the court certified a national class and the plaintiffs were able to show that the defendants engaged in illegal anti-competitive behavior, they still needed to devise a plausible damage theory. Though this issue would not arise until considerably late in the litigation, counsel for the plaintiffs would have been derelict in their duty if they did not investigate the impact of the conference call network on poultry prices early on and at least attempt to develop credible economic evidence. The initial results of their study of the poultry market during this critical time period were disheartening. In commencing a suit earlier against the NBMA, the Justice Department elected to seek only injunctive, and not monetary, relief after experts at the United States Department of Agriculture concluded that on the basis of a study of the organization's effect on prices the conference call program did not have an appreciable effect on broiler prices. They even went so far as to suggest that a subclass of the plaintiffs, the large retailers, exercised considerable control over price levels. In these experts' opinion the NBMA was too loosely knit and its members too independent for it to exercise a significant degree of market power. Further studies conducted after this litigation had begun did not refute these original conclusions but only reinforced the government's belief that if the NBMA program had any affect on prices, which government experts doubted, this impact could not be measured with enough certainty to support a claim for damages. The plaintiffs' independent efforts to estimate their damages were no more convincing. Using a multi-variable regression analysis to attempt to isolate the impact of the NBMA's activities from the other variables influencing the market price, and therefore to determine whether the NBMA successfully altered broiler production patterns and prices, the plaintiffs' expert agricultural economists were unable to say with any assurance whether the conference call network had any more than an intermittent effect on market prices. They

concluded, after modifying their equation to account for the likely downturn in demand for chicken during the PCB scare of 1972–72, and after narrowing the range of damages intuitively, that the damages attributable to the activities of the NBMA probably fell within the range of 23–26 million dollars. This estimate, though reasonable, was still a matter of some speculation, despite the extensive testing done by these two experts. Whether the plaintiffs could have marshaled sufficient evidence to prevail on this issue need not be determined here, but recent decisions in this circuit would suggest that the statistical testing, even when combined with the self-aggrandizing statements of the NBMA's staff members, would not sustain the plaintiffs' burden of proof on the issue of damages. *E.g., Chrysler Credit Corp. v. J. Truett Payne, Inc.,* 607 F.2d 1133 (5th Cir.1979); *Kestenbaum v. Falstaff Brewing Corp.,* 514 F.2d 690, 698 (5th Cir.1975), *cert. denied,* 424 U.S. 943, 96 S.Ct. 1412, 47 L.Ed.2d 349 (1976).

In sum, plaintiffs' counsel undertook, with only a remote chance of success, what they could expect to be an extremely protracted, complex suit against knowledgeable and zealous defense attorneys. During the course of this litigation they received a boost from the government's suit against the NBMA, but the cases could not have been carried to this successful conclusion were it not for the skill, experience, and perseverance of the lawyers shouldering this burden. Besides creating a sizeable settlement fund for distribution to the defendants' customers, these attorneys also are responsible for several collateral benefits flowing from the suits. For one, the NBMA has disbanded under the threat of antitrust liability, thus eliminating what was believed to be inflating market prices. Also, though the stipulated dismissals came before the court was in a position to rule on the class certification motion or on any issues of liability—and thus the outcome here has no precedential value—the mere fact that the suits were filed and prosecuted to a successful end will discourage others from following the NBMA's example.

It is apparent from this overview that the decision to undertake this litigation was extremely risky, that the benefits from the successful result spread far beyond the immediate parties, and that there is a positive correlation between these attorneys' efforts and the results achieved here. Not all the compensable time, however, was spent under the specter of defeat and financial ruin. The plaintiffs' strategy was simply to divide and conquer. They figured that by settling with the smaller defendants first, they could obtain badly needed information about the NBMA, its members and its operations, as part of the settlement agreements and could then bring greater pressure to bear upon the more litigious defendants. If their strategy worked according to plan, eventually those who refused the plaintiffs' offer of settlement initially would be isolated, while the plaintiffs would have acquired the information and the coffer necessary to pursue these holdouts. The remaining defendants would then have no choice but to contribute their fair share to the settlement fund.

To the plaintiffs' credit, their strategy worked almost exactly as planned. As early as April, 1975, before several of the suits were even filed, the plaintiffs came to terms with Cargill, Inc. and The Pillsbury Co., both of whom were non-members of NBMA and had participated in very few conference calls. By the summer of 1977, only the most recalcitrant defendants remained. Though settlement negotiations were to continue for several years, the momentum achieved by the early breakthroughs was to build steadily every year until the consummation of the last agreement. The watershed in the negotiations was perhaps the Fifth Circuit's reversal of Judge Henderson's Capper-Volstead Act ruling on April 22, 1977, when the defendants first realized the vulnerability of what had been their principal defense; the Supreme Court's affirmance of this decision a year later eliminated any lingering doubts that the Capper-Volstead Act would shield the defendants from antitrust liability. The plaintiffs' bargaining position, then, was steadily fortified throughout this litiga-

tion. But even once most of the defendants had agreed to settle, there was still the risk that the whole process would break down if the opt-out provisions were invoked.

The court acknowledges the risks assumed and the obstacles overcome by counsel in accepting sole responsibility for prosecuting this litigation and in carrying it to a successful conclusion. Under the circumstances the court concludes that the lodestar awards should be enhanced by a multiple to account for this risk and to reward counsel for their skillful performance. The multiple selected, however, will reflect the diminishing probability of failure as the final stages of the settlement negotiations were reached. The question then becomes how to quantify these subjective factors. It is easy for the court to say that the litigation was risky, that counsel was skillful, or that payment for their services was delayed for several years, but it is quite different to conclude that for these reasons the multiplier should be 2.0, 2.25, or 3.0. Based on his review of results in other cases, his observation of the lawyers in this litigation as liaison counsel, and his understanding of the issues involved, Mr. Vickery testified that lead and liaison counsel should receive a multiplier of 3.0, Mr. Landis and his firm a multiplier of 2.75, and the remaining firms 2.5. These figures, while they may be reasonable, fall toward the higher end of the range created by previous decisions. *Compare Arenson v. Board of Trade of Chicago,* 372 F.Supp. 1349 (N.D.Ill. 1974) *and Labbee v. Wm. Wrigley Jr. Co.,* Antitrust & Trade Reg. Rep. (BNA) A–29, at 719 (W.D.Wash.1975) *with Merola v. Atlantic Richfield Co.,* 515 F.2d 165 (3d Cir. 1975) *and In re Master Key Antitrust Litigation,* 1978–1 Trade Cas. ¶ 61,887 *and City of New York v. Darling-Delaware,* 440 F.Supp. 1132 (S.D.N.Y.1977) *and In re Clark Oil & Refining Corp. Antitrust Litigation,* 422 F.Supp. 503 (E.D.Wis.1976) *and In re Gypsum Cases,* 386 F.Supp. 959 (N.D.Cal. 1974). The acknowledged goal is to compute a fee that approximates as closely as possible the reasonable market value of the attorney's services without trenching upon

the rights and interests of the absent, unrepresented class members in the process. Unless the court knows beforehand precisely what this reasonable value should be, the selection of an appropriate multiplier must follow essentially a trial and error course. If the use of one multiplier over another results in what the court feels is an unreasonably high or low fee, then the multiplier must be adjusted to comport with the court's perception of the proper fee award under the circumstances.

 Beyond this issue is the question how the multiplier or multipliers should be applied. In *In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions,* 410 F.Supp. 680 (D.Minn.1975), after assigning a multiple of 3.0 to lead counsel's lodestar, Judge Lord segregated the hours spent by the other attorneys into mutually exclusive categories, such as general research, court appearances, and settlement administration, and designated the highest multipliers for the work thought to be the most significant. *Accord, Wolf v. Frank,* 555 F.2d 1213 (5th Cir.1977). In other cases courts have applied the same multiplier to all the time spent by a firm or an attorney. *E.g., In re Gypsum Cases,* 386 F.Supp. 959 (N.D.Cal.1974); *Arenson v. Board of Trade of Chicago,* 372 F.Supp. 1349, 1358–59 (N.D. Ill.1974). *See also Baughman v. Wilson Freight Forwarding Co.,* 583 F.2d 1208, 1217–19 (3d Cir.1978). The court concludes that under the circumstances the appropriate method for calculating and applying a multiplier is to segregate the contribution of lead and liaison counsel from that of the other attorneys involved and assign the highest multiple value to all the compensable time the former invested here. *See In re Master Key Antitrust Litigation,* 1978–1 Trade Cas. (CCH) ¶ 61,887 (D.Conn.1977); *In re Equity Funding Corporation of America Securities Litigation,* 438 F.Supp. 1303 (C.D.Cal.1977). The other leading figures in this litigation will be awarded the next highest multiplier, while the lodestar award of all those occupying more of a supporting role will all be enhanced by the same multiple. The exceptions to this rule are Mr. Galligan, the majority of whose time was spent overseeing the administration of the settlements, and the public attorney generals, who did not work under the same pressures as private counsel. Because Mr. Galligan's work entailed less risk, though it was performed with considerable skill, a lower multiplier will be used. As for the States of Pennsylvania, New Jersey, and Massachusetts, in recognition of the fact that public attorney generals do not assume the same risks of failure and nonpayment when they commence or join a complex suit as do private attorneys, the court has decided not to enhance their lodestar awards. State attorneys are charged with promoting the public interest, which necessarily includes challenging anticompetitive practices affecting the state and its residents as consumers. While the state cannot commit public funds recklessly to expensive antitrust litigation without damaging its legal department's prospects for overall success, the decision to bring suit does not carry the same import for survival as for private counsel, and for this reason the court feels that their fee award, as it stands, is fair and reasonable.

 For lead and liaison counsel, Messrs. Shapiro and Bondurant, the court feels that a multiplier of 2.25 accurately weighs these competing factors and when applied to their lodestar award will approximate the reasonable market value of their services to the class. Maintaining a unified front was of critical importance to the plaintiffs' settlement and trial strategy. By holding the class together in the face of divisive issues, these two attorneys are largely responsible for the favorable result obtained here. A multiplier of 2.0 will be applied to the remainder of the hours spent by their respective firms and to the time expended by other leading figures in this litigation. A multiplier of 1.75 will be assigned to all other expenditures of time by these private firms. Though the time spent by all these firms was subject to the same risk of failure and nonpayment, and without intending to downgrade the performance of any attorney or firm, the court differentiates between the contributions of

the various attorneys and firms in recognition of the varying degrees of skill and commitment displayed. And finally, a multiplier of 1.5 will be applied to the lodestar award of Mr. Galligan.

 Before the final awards are computed, the court feels that one last point should be made. Several of the attorneys requesting fees have suggested that the time spent preparing the fee petitions should be included in the court's computation of the lodestar amount. In support of this position the court has been referred to a recent Fifth Circuit decision, *Rose Pass Mines, Inc. v. Howard,* 615 F.2d 1088 (5th Cir.1980), in which the court stated that "[i]t would be unduly penurious" to require an attorney to prepare a detailed accounting of all the time spent in a case without compensating him for the time reasonably devoted to this chore. The authority for awarding attorneys' fees in *Rose Pass,* however, was derived from a statute, section 64(a)(1) of the Bankruptcy Act, 11 U.S.C.A. § 104, and rule 219(c)(1) of the Rules of Bankruptcy Procedure, which require only that the amount of compensation awarded be reasonable. *Cf. Johnson v. State of Mississippi,* 606 F.2d 635 (5th Cir.1979) (42 U.S.C.A. § 1988). Here the court is bound by the limitations imposed by the equitable fund doctrine; it has no authority to award fees from the settlement fund in excess of the reasonable value of the benefits conferred upon the class by the petitioner. Several district courts have awarded fees for time spent in preparing a petition only to be reversed by an appellate court on the ground that the preparation of a fee application benefits only the attorney and not the class. *E.g., City of Detroit v. Grinnell Corp.,* 1976–1 Trade Cas. (CCH) ¶ 60,913 (S.D.N.Y.1976), *aff'd in part and rev'd in part,* 560 F.2d 1093, 1102 (2d Cir.1977); *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.,* 382 F.Supp. 999 (E.D.Pa.1974), *vacated,* 540 F.2d 102, 111 (3d Cir.1976). *See also Computer Statistics, Inc. v. Blair,* 418 F.Supp. 1339, 1350 (S.D. Tex.1976), and the cases cited. The court concurs with the reasoning adopted in these cases. An entirely different issue would be presented if the settling defendants had agreed to pay the plaintiffs' legal expenses out of their own pockets, but as long as these fees must be deducted from the plaintiffs' fund, the court feels that the costs of preparing these fee petitions should be absorbed by those who alone will benefit from any award. The court is confident that the fees awarded here will adequately compensate counsel for their contributions to this litigation.

Accordingly, the court makes the following awards of attorneys' fees:

| | LODESTAR | MULTIPLIER | AWARD |
|---|---|---|---|
| **Dickstein, Shapiro & Morin** | | | |
| David I. Shapiro | $251,850.00 | 2.25 | $ 566,662.50 |
| Arthur J. Galligan | 146,406.25 | 1.5 | 219,609.37 |
| James vanR. Springer | 72,277.50 | 2.0 | 144,555.00 |
| Other Partners | 11,040.00 | 2.0 | 22,080.00 |
| Joel Kleinman | 278,996.25 | 2.0 | 557,992.50 |
| Other Associates | 34,980.00 | 2.0 | 69,960.00 |
| Local Counsel: James C. Wood | 7,182.50 | 2.0 | 14,365.00 |
| Paralegals | 177,975.00 | 2.0 | 355,950.00 |
| Law Clerks | 3,561.25 | 2.0 | 7,122.50 |
| | $984,268.75 | | $1,958,296.87 |
| | | | |
| **Kilpatrick & Cody and Trotter, Bondurant, Griffin, Miller & Hishon** | | | |
| Emmet J. Bondurant | $112,212.50 | 2.25 | $ 252,478.12 |
| Jerre Swann and Miles Alexander | 2,780.00 | 2.0 | 5,560.00 |
| Associates | 16,975.00 | 2.0 | 33,950.00 |

| | LODESTAR | MULTIPLIER | AWARD |
|---|---|---|---|
| Paralegals | $ 16,872.50 | 2.0 | $ 33,745.00 |
| | $148,840.00 | | $ 325,733.12 |
| **Berger & Montague** | | | |
| David Berger | $ 21,825.00 | 2.0 | $ 43,650.00 |
| H. Laddie Montague, Jr. | 78,281.25 | 2.0 | 156,562.50 |
| Joel C. Meredith | 64,950.00 | 1.75 | 113,662.50 |
| Merrill G. Davidoff | 16,347.50 | 1.75 | 28,608.13 |
| Steven J. Greenfogel | 68,378.75 | 1.75 | 119,662.81 |
| Robert S. Balter | 11,927.50 | 1.75 | 20,873.13 |
| Richard Eppinger | 18,988.25 | 1.75 | 33,230.31 |
| Other Attorneys | 5,811.25 | 1.75 | 10,169.69 |
| Law Clerks | 6,282.50 | 1.75 | 10,994.38 |
| Paralegals | 9,157.50 | 1.75 | 16,025.63 |
| Local and Associate Counsel | 9,565.00 | 1.75 | 16,738.75 |
| | $311,515.00 | | $ 570,177.83 |
| **Specks & Goldberg, Ltd.** | | | |
| Granvil I. Specks | $ 45,843.75 | 2.0 | $ 91,687.50 |
| Perry Goldberg | 28,875.00 | 1.75 | 50,531.25 |
| Associates | 20,040.00 | 1.75 | 35,070.00 |
| Associate Counsel: Wald & Wald | 6,375.00 | 1.75 | 11,156.25 |
| | $101,133.75 | | $ 188,445.00 |
| **Freeman, Rothe, Freeman & Salzman** | | | |
| Lee A. Freeman | $ 7,125.00 | 1.75 | $ 12,468.75 |
| Lee A. Freeman, Jr. | 1,147.50 | 1.75 | 2,008.13 |
| Jerrold E. Salzman | 32,913.00 | 2.0 | 65,826.00 |
| Associates | 14,427.50 | 1.75 | 25,248.13 |
| Associate Counsel | 9,212.50 | 1.75 | 16,121.88 |
| | $ 64,825.50 | | $ 121,672.89 |
| **Carlton, Fields, Ward, Emmanuel, Smith & Cutler** | | | |
| James M. Landis | $142,540.00 | 2.0 | $ 285,080.00 |
| Associates | 13,046.00 | 1.75 | 22,830.50 |
| Paralegals | 23,512.50 | 1.75 | 41,146.86 |
| Paul L. Pascal | 573.75 | 1.75 | 1,004.06 |
| | $179,672.25 | | $ 350,061.42 |
| **State of New Jersey** | | | |
| Laurel Price | | | $ 30,366.00 |
| Supporting Personnel | | | |
| Deputy Attorney Generals | | | 40,671.00 |
| Special Investigator | | | 412.50 |
| | | | $ 71,449.50 |
| **State of Massachusetts** | | | |
| Steven J. Greenfogel | | | $ 58,725.00 |
| **State of Pennsylvania** | | | $ 15,303.00 |

*Applications for Costs*

■ All those requesting attorneys' fees and the State of New York have petitioned the court for the costs and expenses in- curred in creating the fund, $199,113.03 in all. The court acknowledges that out-of- pocket expenses are chargeable to the set- tlement fund under the benefit conferred

theory, but if an award of costs is based upon this equitable theory, then the expenses must be reasonably related to some benefit conferred on the class and they must be substantiated by the applicant's records. Duplicative costs will be denied; the class will be taxed only with the costs fairly devoted to the creation of the fund. There is ample reason to believe, however, that the scope of allowable costs here is greater than what the court might require a losing party to pay after a decision on the merits. *See Alpine Pharmacy, Inc. v. Chas. Pfizer & Co., Inc.,* 1973–1 Trade Cas. (CCH) ¶ 74,350 (S.D.N.Y.1972), *aff'd in part and rev'd in part,* 481 F.2d 1045 (2d Cir.), *cert. denied,* 414 U.S. 1092, 94 S.Ct. 722, 38 L.Ed.2d 549 (1973), *on remand,* 1973–2 Trade Cas. (CCH) ¶ 74,826 (S.D.N.Y.1973). After reviewing these applications, however, the court concludes that more documentation of the necessity and relevance of some of these expenses is required before it can determine whether the applicants should be reimbursed from the fund. Accordingly, the court defers consideration of the applications for costs until it has had an opportunity to notify these applicants and the necessary information has been identified and submitted.

*Conclusion*

The court hereby awards $3,659,864.63 to counsel for the plaintiffs to be distributed in accordance with its directions. In computing these fees the court has sound reasons for believing that the compensable costs of this litigation have been shifted with sufficient certainty to those benefiting from the creation of the settlement fund. The class of beneficiaries is relatively small in number and can be identified without any difficulty. Also, the benefits flowing to this class can be traced with some accuracy to the attorneys' efforts. Further consideration of those requests that were not documented sufficiently—those of Jones, Bird & Howell, of Messrs. Daniel Berger and Eugene Lipkowitz and Ms. Phyllis Kaufman of Berger & Montague, of Savell, Williams, Cox & Angel, of Portman & Port-

man, and of Speer, Herzog & Ponfil—has been deferred until a more detailed accounting of the time spent on this litigation is submitted. In summary, the court concludes that the fees awarded reasonably approximate the full value of the benefits each attorney conferred upon the whole class.